## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| BARRY EARLS, THOMAS FETSCH, DAVID KIEL, TRENT SHORES, STEVE SCHUSSLER, CASSIE LIETAERT, CHRIS JESSE, individually and on behalf of a class of similarly situated individuals, | Case No. 20 CV 107 |
| Plaintiffs, | Hon. James D. Peterson |
| v. | |
| MENARD, INC., a Delaware [sic] corporation, and JOHN DOES 1-10, | |
| Defendants. | |

### MEMORANDUM OF LAW IN SUPPORT OF MENARD INC.'S
### MOTION FOR SANCTIONS PURSUANT TO 28 U.S.C. § 1927

After cruising the internet and assembling a selection of on-line comments and complaints about Menards' hugely-successful 11% Off Everything* rebate program, plaintiffs' counsel, who admittedly never verified any of that chatter, concocted a theory for a class action: that Menards "systematically and intentionally" cheats its customers everywhere out of the very 11% Off Everything* rebates it promises to issue.  And to pursue that class action, it appears that counsel advertised for and conscripted Menard customers to be plaintiffs, telling them – as a factual matter – that "Menards aggressively advertises and offers these rebates to entice consumers to purchase products with the hope that many consumers will fail to send in the requisite paperwork, will not notice the rebate check and/or will not redeem the rebate."[1]

---

[1] *See e.g.,* https://www.tzlegal.com/rebate-at-menards-investigation/ (last visited April 16, 2021.)

Apparently believing counsel's representations, a number of individuals – the named plaintiffs here – fell for counsel's ploy and joined this case as plaintiffs.  That, in a nutshell, is how this case came to be.

The problem, as Menards' extensive investigation and discovery of the named plaintiffs has confirmed, is that it was built on nothing more than a series of lies.  And, as Menards' investigation and discovery has also confirmed, plaintiffs' counsel knew (or should have known) that from the very beginning.

That all starts with counsel's concocted internet-based class action theory.  There was – and is – no factual basis for counsel's contention that Menards "systematically and intentionally" cheats customers out of rebates.  Nor was – or is – there any basis for counsel's solicitation pitch that Menards advertises rebates hoping customers will not participate or redeem them.  Menards' 11% Off Everything* rebate program is its most popular – indeed, flagship – sales program.  It has run for over 10 years, and has a participation rate that is literally off the charts in comparison to other programs.  It is also Menards' customer loyalty program: the rebate is in the form of a merchandise credit check specifically designed to bring customers back to purchase additional products at Menards' stores.  Counsel's factual assertion that Menards does not want customers to participate or redeem rebates was patently false.

But more significantly for purposes of this motion, the same is true for the factual allegations about the individual plaintiffs whom counsel duped into joining this case.  Six of the original 13 plaintiffs were subject to binding arbitration clauses that barred them from asserting claims against Menards in this case at all, either individually or on behalf of a purported class. Counsel disregarded this critical fact completely, even though the very rebate form counsel pasted into the complaint contained the arbitration clause.  And the other plaintiffs that counsel

recruited either did not purchase the products at issue during an 11% Off Everything* sale in the first place or, if they did, were actually issued the appropriate rebates by Menards. Counsel disregarded these facts as well.

Simply put, in their eagerness to gin up a massive nation-wide class action against Menards (and, no doubt, to recover substantial fees for themselves) plaintiffs' counsel either woefully failed to investigate – or turned a blind eye to – the actual facts and circumstances of the very plaintiffs they lined up to serve as representatives. In doing so, counsel pursued this action in bad faith, causing Menards to incur substantial costs and fees defending against counsel's actions. Under 28 U.S.C. § 1927 and governing Seventh Circuit law, those costs should properly be borne by plaintiffs' counsel, not Menards.

## BACKGROUND

### A.    Menards' 11% Off Everything* rebate program

Plaintiffs' claims in this case center on Menards' 11% Off Everything* rebate program, which Menards has run regularly since 2011. Dkt. 66 at 14:7, 38:15-21. As explained in Menards' flyers, website, customer emails, social media, sales/rebate receipts and mail-in rebate forms and instructions, the 11% rebate is a mail-in rebate in the form of a credit on future in-store purchases. Dkt. 66 at 49:9-51:23, 59:22-60:1, 60:16-21.

At all times relevant, Menards printed flyers, website, customer emails, and rebate instructions all contained the following disclosure:

> * Mail-in-Rebate. Rebate is in form of merchandise credit check, valid in-store only. Merchandise credit check is not valid towards purchases made on MENARDS.COM®. Limited to stock on hand. No sorry slips. First come, first served. Future sale price adjustments, exchanges and merchandise returns will void the 11% rebate on the items adjusted, exchanged and/or returned. Rebate is valid on special ordered products but does not extend to the special ordering of any normally stocked items. Not good with any other coupons or offers except Menards® coupons, Menards rebates and manufacturers' coupons. Multiple receipts may accompany one rebate certificate. Menards reserves the right to

3

limit purchases of any and all items to reasonable job lot quantities.  **Excludes event tickets, gift cards, propane purchases, delivery and handling charges, all rental items, minuteKEY®, processing fees, packaging charges and extended service agreements.**

Dkt. 49 at ¶ 48.

When a customer purchases products at a Menards store during an 11% Off Everything* sale, he/she receives two receipts at the register, joined together: (i) the usual sales/transaction receipt with the purchase details, and (ii) a "rebate receipt" at the bottom. https://www.menards.com/main/rebates/c-13180.htm**.**  To obtain the rebate, a customer must do three things:

(1)     obtain the "rebate form" that corresponds to the 11% Off Everything* rebate sale, which are available in-store and on-line;

(2)     detach and enclose the original Menards' "rebate receipt" and the completed form in an envelope; and

(3)     mail that envelope with the form and rebate receipt to "SAVE 11%, P.O. BOX 155, Elk Mound, WI 54739-0155."

Dkt. 49 at ¶¶ 56-60.  The rebate receipt and the rebate form both specify the date by which the rebate submission must be mailed, which is three weeks after the particular sale ends.  Dkt. 66 at 59:8-16.

Once Menards receives these items, the rebate submission is processed by an internal group called Rebates International.  Dkt. 69 at 41:12-24.  To ensure that no timely-submitted rebate is rejected, Menards' rebate system will accept and process rebates many months after a rebate sale ends.  During the time period relevant to plaintiff's claims, that period was initially 6 months, later extended to 12 months.

Rebate receipts contain bar codes that link to the relevant purchase transaction record. Dkt. 69 at 98:10-25.  This bar code is scanned, and Menards' rebate system accesses the transaction record and automatically calculates the 11% rebate based on the qualifying items that

were purchased, after taking into account any pre-processing returns or exchanges (transaction records keep track of returns). Dkt. 69 at 28:3-21. The resulting rebate is then automatically issued to the customer in the form of a merchandise credit check. *Id.* Multiple rebate forms/receipts may be included in the same envelope and multiple rebates may be included in single merchandise credit check. Dkt. 69 at 11-14. In all, the process takes between 6-8 weeks. Dkt. 49 at ¶ 60. Once a rebate is processed, a customer can track the status of the rebate on-line. *Id. at* ¶ 66.

Menards' 11% Off Everything* rebate sales are extremely popular. Dkt. 9 at ¶ 4. Between 2014 and 2017 alone (the period relevant to plaintiff's purported class action) Menards processed and issued over 94,000,000 11% Off Everything" rebates (Boland Decl. ¶ 10), which is more than the first batch of stimulus checks the federal government issued in March 2021 under the $1.9 trillion American Rescue Plan.[2]

The 11% Off Everything* rebate program is Menards' customer loyalty program. Dkt. 66 at 73:7-9. As a merchandise credit check usable against future purposes, it is specifically designed to encourage customers to return to Menards' stores and continue to make additional purchases. *Id*. at 24:16-25:2. And it is successful. The participation rate on a total dollar basis is nearly 70%, meaning that Menards issues merchandise credit checks in an amount equal to approximately 70% of the total dollars eligible for 11% rebates. *Id*. at 26:1-12. And the redemption rate is equally high. Of the merchandise credit checks issued, customers redeem

---

2   https://www.cnbc.com/2021/03/17/stimulus-update-us-issued-90-million-checks-worth-242-billion.html   (last visited 4/16/21.)

approximately 91% on a total dollar basis.[3]  *Id.* at  27:8-23.  This is up to six times the industry average that plaintiffs' counsel  themselves identified.  Dkt. 27 at ¶ 20.

### B.    Plaintiffs' Complaints and Menards' Motions to Dismiss

#### 1.    Plaintiffs' Original Complaint

On February 6, 2020, plaintiffs filed their initial complaint.  Dkt. 1.  Thirteen plaintiffs sued Menards.  With some variation, each of these plaintiffs generally alleged that he/she (1) made a purchase or purchases at Menards during one of its 11% Off Everything* rebate sales, (2) applied to Menards by mail for an 11% rebate, and (3) either never received a rebate at all or received a rebate for less than the amount due.  Based on these allegations, plaintiffs asserted claims for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and violations of the consumer fraud laws in six states.  *Id.* at ¶¶ 181-281. And, based on an allegation formed solely by counsel that Menards "systematically and intentionally fails to pay the 11% rebate to consumers who have followed the rebate process," plaintiffs purported to assert these claims on behalf of myriad nationwide and state-specific classes.  *Id.* at ¶ 7.

Unbeknownst to Menards at the time, but as later discovered when investigating the remaining plaintiffs' claims, the central "class action" allegation in the complaint – that Menards "systematically and intentionally" denies or underpays rebates – was something plaintiffs' counsel had concocted earlier.  It now appears that to lure Menards' customers into asserting claims against it, counsel made the following (false) representation about Menards' 11% Off Everything* rebate program on the internet:

---

[3] Plaintiffs' counsel knew or reasonably should have known all these facts, which were publicly available as part of the record in *Rikkers v. Menard, Inc.*, No. 17 CV 1208 (E.D. Wis.).  Both of Plaintiffs' complaints specifically reference the *Rikkers* case (Dkt. 1 at ¶ 45 n.4; Dkt. 27 ¶ 68 n. 15), and, during a conference early in the case, plaintiffs' counsel told Menards' counsel that they had been in contact with plaintiffs' counsel in *Rikkers*.  Boland Decl. ¶ 3.

> We are investigating whether Menards home improvement store engaged in potentially unfair business practices that may violate the law through its rebate programs. Menards offers two kinds of rebates to consumers: rebates on specific products and temporary 11% rebates on all in-store items. **Menards aggressively advertises and offers these rebates to entice consumers to purchase products with the hope that many consumers will fail to send in the requisite paperwork, will not notice the rebate check and/or will not redeem the rebate.**

https://www.tzlegal.com/rebate-at-menards-investigation; emphasis added.[4]  Although Menards was only able to depose three plaintiffs before counsel dismissed the case, the records strongly suggest that this is how the thirteen plaintiffs were persuaded to sue Menards.[5]

In response to the complaint, Menards did two things.  First, Menards filed a petition to compel six plaintiffs – Childers, Italia, Mansoor, Rider, Ingalls, and Fleckenstein – to arbitrate their claims.  Dkt. 7.  In their rush to press a class action, plaintiffs' counsel ignored completely that these plaintiffs' alleged purchases and rebate submissions were governed by a binding arbitration clause that precluded class actions and was part of the very rebate form counsel pasted into the complaint.  Dkt. 1 at ¶ 41.  The complaint neither acknowledged this clause nor attempted to make any allegations about why it would not or should not require these plaintiffs to arbitrate.  On September 4, 2020, the Court granted Menards' petition.  Dkt. 26.

Second, Menards moved to dismiss the claims of the remaining seven plaintiffs pursuant to Fed. R. Civ. P. 12(b)(6).  Dkt. 10.  Among other things, Menards moved to dismiss their claims because these plaintiffs failed to allege that they had complied with the conditions precedent to Menards' performance under their alleged rebate contracts – *i.e.*, that they had

---

[4] In the same solicitation counsel also misrepresented the terms of Menards 11% Off Everything* rebate sale, telling the public that the "required paperwork" was the "original receipt" as opposed to the original "rebate receipt."

[5] Each of the plaintiffs' whom Menards deposed testified that he became a plaintiff after seeing material online about Menards' rebate program that lead them to one of plaintiffs' counsel.  Boland Decl. Exs. 1-3, (Earls Tr. 54:15-21, Fetsch Tr. at 38:25-24 and 41:17-42:5, and Jesse Tr. at 40:2-41:21).  While no plaintiff produced the documents that Menards requested  relating to their initial (non-privileged pre-engagement) contacts with potential counsel (or provided a log of these), Menards has since uncovered the online solicitation identified above that matches the description plaintiffs gave in their depositions.

actually mailed the completed rebate form ***and original rebate receipt*** to Menards as required. Dkt. 11 at 10-11.  Menards also moved to dismiss plaintiffs' consumer fraud claims on the grounds that, among other things, plaintiffs had failed to plead fraud with the particularity required by Fed. R. Civ. P. 9(b) or allege that any false statement or representation by Menards proximately caused them to suffer any damages.  Dkt. 11 at 21-23.

Plaintiffs' opposed, vigorously arguing that each and every plaintiff had sufficiently alleged the he or she had satisfied the conditions precedent and had sufficiently alleged fraud and causation.  Dkt. 18 at 9-11, 17.  The Court accepted plaintiffs' arguments about the former, but agreed with Menards on the latter.  Dkt. 26.  Plaintiffs were granted leave to re-plead their consumer fraud claims.  *Id*.

### 2.    Plaintiffs' First Amended Complaint

After the Court granted Menards' motion, in part, and before plaintiffs re-filed their consumer fraud claims, Menards sent plaintiffs' counsel a letter.  Boland Decl. Ex. 4.  In it, Menards specifically warned plaintiffs' counsel that they had no good faith basis to assert consumer fraud claims against Menards.  *Id*. at 2.  Specifically, Menards cautioned plaintiffs that because they had the publicly available information about Menards and its rebate program from another class action pending in the Eastern District of Wisconsin, they were on clear notice that their allegation that Menards "systematically and intentionally fails to pay the 11% rebate to consumers who have followed the rebate process" was false:

> Plaintiffs know this because they have access to the Declaration of Michael Every … which is part of the public record in *Rikkers v. Menard, Inc.*, No. 17-CV-1208 (E.D. Wis) referenced in their complaint. (Dkt. No. 9 at ¶45, n. 4.) That Declaration confirms that on average Menards issues merchandise credit checks for its 11% rebate sales in an amount equal to 70% of the total dollars eligible for rebates, which is greatly in excess of average rebate redemption rates. In addition, on a total dollar basis, customers have so far used on average 91% of the merchandise credit checks Menards has issued to make additional purchases.

Plaintiffs also know that Menards does not systematically and routinely deny or substantially underpay promised rebates or takes steps to drive down the redemption rate because of their own buying experiences under Menards' 11% rebate sales. As Plaintiffs are well aware, they have routinely participated in Menards 11% rebate sales for years, applying for, receiving and redeeming dozens of merchandise credit checks. These facts undermine any notion that Plaintiffs in this case can plausibly allege that Menards "systematically and routinely denies or substantially underpays promised rebates and takes steps to further drive down the redemption rate" consistent with their obligations under the Federal Rules of Civil Procedure.

*Id.*

Undaunted, plaintiffs' counsel pressed forward, filing an amended complaint with all of the same claims and allegations about Menards' rebate program that they had been shopping to potential plaintiffs on the internet.  Counsel also tried to remedy their failure to plead causation by specifically alleging that each remaining plaintiff saw a Menards' 11% Off Everything* sale ad and that this ad "factored into" each plaintiff's purchase decision.  Dkt. 27 at ¶¶ 90, 97, 114, 130, 138, 139, and 158.

In addition to trying to shore up their consumer fraud claims, counsel also added allegations to specifically allege compliance with the conditions precedent for Menards' rebate. Thus, for each plaintiff, counsel added allegations that he/she specifically mailed the original rebate receipt and rebate form to Menards as required by the terms of the 11% rebate program. *Id*. at ¶¶ 92, 100, 116, 131, 140, 150, and 161.

Menards moved to dismiss plaintiffs' amended claims, but, accepting plaintiffs' revised allegations as true, the Court denied that motion.  Dkts. 29 and 48.

### C.    Plaintiffs' False Factual Allegations About Themselves

As explained above, the crux of each plaintiff's claim is that he/she (1) made a purchase or purchases at Menards during one of its 11% Off Everything* rebate sales, (2) applied to Menards by mail for an 11% rebate, and (3) either never received a rebate at all or received a

rebate for less than the amount due.  These are basic facts about each plaintiff that each plaintiff necessarily knows.  Put another way, no discovery from Menards was required for plaintiffs to know the facts about themselves.

In discovery, Menards attempted to obtain detailed information about each of the plaintiff's alleged transaction(s) with Menards.  Menards served interrogatories specifically asking for the details of these purchases – dates, items purchased, methods of payment, etc. – so that Menards could research those transactions.  Boland Decl. ¶ 4.  Menards also asked plaintiffs to produce the documents relating to these transactions.  *Id.*

In response, plaintiffs' counsel engaged in a tactic that can only be described as stonewalling.  Hiding behind a barrage of stock and frankly ridiculous objections concocted by counsel, plaintiffs essentially refused to produce most of the information that Menards requested. Boland Decl. Exs. 5-16.  This included the details of their alleged transactions with Menards both before and after Menards' began its 11% Off Everything sales (because plaintiffs' alleged these sales lured them into Menards's stores), including, tellingly, the credit card and other details that would allow Menards to research the specific transactions identified in the complaints and verify whether what plaintiffs had alleged about themselves was true.  Boland Decl. Exs. 5-10 at  Interr. Resp. No. 3.

Menards' persistent investigation and discovery has now revealed why.  Two of the plaintiffs (Earls and Shores) did not even purchase product during an 11% Off Everything* rebate sale and the others (Jesse, Schussler, Fetsch and Lietaert) were all issued the proper rebates.[6]  Simply put, there was no factual basis for any of these plaintiffs to be suing Menards in the first place.

---

[6] The last plaintiff, David Kiel, essentially dropped out of the case after the complaint was filed (or perhaps even before).  Kiel never responded to any of Menards' discovery requests, and plaintiffs' counsel told Menards months

### 1.    Barry Earls

In the initial complaint, Earls alleged that he (1) purchased a pole barn garage package from Menards on June 17, 2017 "during the 11% Off Everything promotion" Dkt. 1. at ¶ 86; (2) filled out a rebate "coupon" within a week of his purchase and mailed it to Menards *id*. at ¶ 89; (3) was entitled to $756.56 in rebates "based upon the 11% Off Everything promotion" *id*. at 90; (4) received, in November 2017, a rebate for "approximately" $456 *id*. at ¶ 93; (5) contacted Rebates International about the rebate and received a letter stating "without further explanation" that "the remainder of his rebate would not be forthcoming" *id*. at ¶ 92.

As explained above, Menards had moved to dismiss Earls' breach of contract claim because he had not affirmatively alleged that he had submitted a rebate receipt and moved to dismiss his consumer fraud claim because he had not alleged causation.  Plaintiffs' counsel argued that Earls had generally averred that he had satisfied all conditions precedent, including that he had submitted a rebate receipt as required by the terms of the 11% Off Everything* rebate sale.

The amended complaint repeated the alleged facts of Earl's pole barn transaction, including that he made this purchase "during the 11% Off Everything promotion" (Dkt. 27 at ¶¶ 113-14), but went further.  Earls also alleged that "[t]he 11% Off Everything promotion factored into his decision to purchase the garage pole barn package from Menards."  *Id*. at ¶ 114.

During discovery, Menards asked Earls to execute declarations attesting to the truthfulness of the factual allegations about his transaction in both the original and amended complaint.  Boland Decl. Ex. 11 at Responses 13 and 16.  He refused.  *Id*.

---

ago that they could not contact Kiel and were planning to dismiss him (apparently without his knowledge).  Boland Decl. ¶ 5.

The reason is clear.  Earls *did* purchase a pole barn package at Menards on June 17, 2017, for a pre-tax price of $6,959.60, as he alleged in his complaint.  Boland Decl. Ex. 17.  Menards, however, was not running an 11% rebate sale that day.  Boland Decl. Ex. 18 at 3 of 6.  These facts were made public in the *Rikkers v. Menards* case.  No. 17-CV-1208 (E.D. Wis.)  Menards' only 11% rebate sale in June 2017 began on June 18, 2017, the day *after* Earls' purchase, and ran through June 24, 2017.  Boland Decl. Ex. 18 at 3 of 6.

And despite his allegations and his counsel's arguments, at his deposition, Earls readily admitted that he knew all along that he had not made his purchase during an 11% rebate sale:

Q.      Would you be surprised to learn that Menards did not have an 11 Percent Off Everything promotion running on June 17th, 2017?

A.      No, I would not be surprised.

Q.      Why not?

A.      Because when I went there, they didn't have one on. It just so happened that I had the funds available and needed to order the material at that time, so      I had no choice but to order it then.

*      *      *

Q.      So you -- when you were at the store, they told you at the store that they were not having an 11 Percent Off Everything promotion that day, and      you still went ahead with your purchase; is that correct?

A.      Yes.

Boland Decl. Ex. 1 at 89:4-12, 90:18-22.

Because Earls had missed the sale, he instead submitted a form to obtain an ***11% price adjustment***, which is a different promotion than the 11% Off Everything* sale.  *Id*. at 99:25-100:15.

As a courtesy, Menards has established a program to allow guests who happen to purchase items in the fourteen days before an 11% Off Everything* rebate sale to obtain an 11%

12

price adjustment on certain of those items.  Dkt. 69 at 108:2-22.  This "11% Price Adjustment" program, which is not advertised but is disclosed on Menards' website, is not the same as the 11% Off Everything* rebate sale.  It has different terms.  Most importantly, only items that were purchased at full price or that were purchased at a sale price that continued during the 11% Off Everything* rebate sale qualified for an 11% price adjustment.

Thus, Earls' allegations in his complaints that (i) he had purchased product during an 11% Off Everything* rebate sale, (ii) he had submitted the 11% rebate form and the original rebate receipt, and (iii) Menards 11% Off Everything* rebate sale ad had factored into his decision to purchase at Menards, were all false.  And, even more significantly for purposes if this motion, his lawyers knew it from the outset.

At his deposition, Earls testified that he had been providing documents to his lawyers "[o]n and off for the last year and a half, two years."  Boland Decl. Ex. 1 at 33:2-5.  Those documents, which were produced to Menards on October 30, 2020, included: (i) Earls' transaction receipt, (ii) a blank copy of the applicable 11% Price Adjustment Form, and (iii) correspondence with Menards about his rebate.  Boland Decl. at ¶ 6; Boland Decl. Ex. 19.  All of these documents demonstrated that Earls had not participated in an 11% Off Everything* rebate sale, but had submitted a form for an 11% Price Adjustment.

*First*, Earls' transaction receipt shows that his purchase was on June 17, 2017, when no 11% rebate sale was running.  Boland Decl. Ex. 18 at 3 of 6; Boland Decl. Ex. 19 at P000001-3.  *Second*, the blank rebate form expressly states that it was for an "11% Price Adjustment," not an 11% Off Everything* rebate sale:



Boland Decl Ex. 19 at P000012.[7]

*Third*, the text of the emails between Earls and Menards confirms that he applied for a price adjustment, not an 11% Off Everything* rebate:

> Barry,
>
> RE: Rebate #4500 11 % Price Adjustment
>
> According to the information received by Rebates International, rebate #4500 11 % Price Adjustment, 06/18/17 thru 06/24/17, has the following line stated on the certificate: Adjustment is for Menards original receipts dated 06/04/17 through 06/17/17 only. Limited to items purchased at full price. Please see the attached certificate.
>
> The original receipt information you submitted qualified you for a $467.48 price adjustment on 06/17/17 purchases for full price and/or non-returned items. Rebates International has fulfilled your submission with check #6155030422, $467.48 issued to you on 07/12117.

*Id*. at P000008-9.

Indeed, Earls' email correspondence confirms that his other allegations were similarly false.   In its email to Earls, Menards did ***not*** state "without further explanation" that "the

---

[7] This form can easily be compared to and distinguished from the 11% Off Everything* rebate sale form that counsel pasted into paragraph 41 of the original complaint and paragraph 58 of the first amended complaint.  Dkt. 1 at ¶ 41; Dkt. 27 at ¶ 58.

remainder of his rebate would not be forthcoming," as Earls' lawyers alleged in both complaints. Dkt. 1 at ¶ 92; Dkt. 27 at ¶ 121.  Instead, Menards reported that Earls rebate was for a ***price adjustment*** and that Earls had received the correct price adjustment rebate on the qualifying items.  Boland Decl Ex. 19 at P000007-9.  As the emails show, certain of the items Earls purchased were on-sale and did not qualify for the price adjustment, and Earls also had returned some items.  *Id.*

All of these facts were readily discernible not only from Earls' own documents, which he had provided to counsel long before they were produced to Menards, but from a simple conversation with Earls.

### 2.    Thomas Fetsch

The evidence shows that plaintiffs' counsel filed both complaints and pursued this action knowing that Thomas Fetsch's allegations were also factually untrue.  Not only did Fetsch actually receive and redeem all of the 11% Off Everything* rebates he alleged he did not get, but he did not comply with the very condition precedent – submission of the original rebate receipts along with the completed rebate form – that was a focus of Menards' first motion to dismiss his claims.

In the original complaint, Fetsch alleged – without specificity – that (1) "between February and July 2016" he purchased several items at Menards in Bismark, North Dakota, "during an 11% Off Everything promotion" "for a total of approximately $1,430" (Dkt 1 at ¶¶ 142-143); (2) after completing his purchases during each visit, he obtained the 11% rebate sale "coupon" (*id.* at ¶ 144); (3) "[t]he same day he completed his purchase," he "filled out the rebate coupon" and mailed it to "a post office box in Elk Mound, Wisconsin" (*id.* at ¶ 150); (4) after waiting "six to eight weeks," he checked the Rebates International rebate tracker and found that there were no pending rebates (*id.* at ¶ 146); (5) he then contacted Rebates International

about the rebates and that, in December 2016, Rebates International "informed [him] via e-mail that they did not have a record of his original or rebate receipts" (*id*. at ¶ 147); and (6) he had been "denied $157.31 in rebates to which he is entitled" (*id*. at ¶ 149).

As with Earls, Fetsch's failure to allege that he complied with the conditions precedent, including the submission of the ***original rebate receipt*** and rebate form, prompted Menards' first motion to dismiss.  Plaintiffs' counsel vigorously opposed Menards' motion, arguing that all plaintiffs had adequately alleged satisfaction of the conditions precedent by mailing both a completed rebate form and original rebate receipt to Menards.  Dkt. 18 at 9-11

In the amended complaint, counsel continued to press the same allegations about Fetsch, including that he did not receive any of the rebates to which he was entitled.  Dkt. 27 at ¶¶ 145-55.  Counsel also added, among other things, a specific allegation that Fetsch filled out the rebate form and included "the original rebate receipts" in the envelope that he sent to Menards.  *Id*. at ¶ 150.

Like Earls, Fetsch was asked in discovery to execute declarations attesting to the truthfulness of the factual allegations concerning his transactions with Menards in the original and amended complaints.  Boland Decl. Ex. 12 at Responses 13 and 16.  He refused.  *Id*.

Unlike Earls, Fetsch actually purchased products during an 11% Off Everything* rebate sale.  He also had email correspondence with Rebates International, beginning on December 20, 2016, concerning his rebates.  But that is where Fetsch's allegations stopped being true.

In discovery, Fetsch produced documents on two dates.  The first production, made on October 30, 2020, consisted mostly of emails with Menards and various receipts.  Boland Decl. ¶ 7.  Significantly, included in that production were photocopies of various original rebate

receipts for purchases during the 2016 time period during which Fetsch alleged he made purchases but received no rebates. Boland Decl. Ex. 20. P000063 is an example:




*Id*. at P000063.

Because original rebate receipts are required to be submitted with the completed rebate forms to obtain a rebate (and satisfy a condition precedent), at his deposition Menards asked Fetsch to explain why he still had the original rebate receipts when he sent emails to Menards in December 2016/January 2017 asking about the status of those rebates. *See* Boland Decl. Ex. 21 at P000043-47. In response, Fetsch admitted that he had been sending Menards his original ***transaction*** receipts with the rebate forms, not the original ***rebate*** receipts:

> Q.     Okay. So what you were doing was for the 11% Off Everything sale, you were sending in the original transaction receipt and keeping the rebate receipt; is that fair?
>
> A.     That is fair.
>
> Q.     Okay. Okay. And you don't do that anymore, do you?
>
> A.     Nope.

Boland Decl. Ex. 2 at 176:3-10. Fetsch also admitted this is why he had the original rebate receipts to photocopy in January 2017:

> Q.     Okay. But in any event, when you maintain -- when you made copies of these rebate receipts that we see in Exhibit 99, that's because you had maintained these but sent in the transaction receipts, right?
>
> A.     Correct.

*Id*. at 177:15-19.

This admission, of course, is directly contrary to the argument plaintiffs' counsel made about Fetsch's satisfaction of the conditions precedent in response to Menards' motion to dismiss and alone was enough to defeat his claims. Dkt. 18 at 9-11. It is also directly contrary to the additional allegations plaintiffs' counsel added to the amended complaint that Fetsch included both the rebate form "and the original rebate receipts" in the envelope that he sent to Menards. Dkt. 27 at ¶ 150.

18

But Fetsch's documents revealed far more.  Because Fetsch's allegations were not specific as to the dates of the alleged purchases for which he claimed he did not receive an 11% rebate, Menards specifically asked Fetsch at his deposition to identify those purchases.  Fetsch testified that the purchases referenced in his complaints were the ones reflected in the copies of original rebate receipts (for the 11% Off Everything* rebates) identified above that he had produced in discovery.  Boland Decl. Ex. 2 at 173:7-16.  ***Contrary to the allegations of both the original and amended complaints, Fetsch further admitted that he actually received and redeemed each and every one of those rebates***.  *Id*. at 230:11-231:5, 249:18-250:1.

Plaintiffs' counsel knew or should have known these facts from the very emails Fetsch gave them long ago.  In his email correspondence with Menards in December 2016/January 2017, Fetsch identified, by number, the rebates he had not received:

> Good morning to you. We have had some problems with our mail so I can not totally blame your process centers. I am just frustrated with the mail in general. I am not sure which rebates I have received this year, so I am sending you all of the ones for this year.
>
> Rebate #4183 02/20/2016 $5.29, #4138 02/20/2016 $9.47 #4035 02/20/2016 $10.88, #4556 04/20/2016 $0.22 & $19.11, #5066 06/07/20016 $28.64 & $1.79, #5076 06/13/2016 $24.52& 06/15/2016 $10.89, #5086 06/25/2016 $2.20 & 06/25/2016 $4.29 & 06/22/2016 $17.87, #5116 07/11/2016 $21.92 and recently #6327 12/14/2016 $29.99, #6033 11/11/2016 $I2.00[sic] and #5988 11/15/16 $5.00.
>
> I know the last 3 rebates should not be here yet, just wanted you to double check to make sure they made it there as well.
>
> Thank you for your help!
>
> Tom Fetsch

*See* Boland Decl. Ex. 21 at P000050.

Fetsch later followed up on January 5, 2017, sending Menards the same photocopies of the original rebate receipts referenced above. *Id*. at P000041-47. Menards responded the next day, telling Fetsch that it would review the materials he submitted. *Id*. at P000041.

Which, as Fetsch's documents confirm, Menards did. In subsequent email correspondence that Fetsch produced, Menards confirmed that each and every one of the 11% Off Everything* rebates that Fetsch had complained about was, in fact, properly issued **and** that Fetsch had redeemed the rebates:

> Tom,
>
> RE: Multiple Rebates
>
> #5086 Save 11% $13.74 adjusted from $17.87
> #5066 Save 11% $28.64
> #5086 Save 11% $4.29
> #5116 Save 11% $21.92
> #4556 Save 11°/a $19.11
> #5066 Save 11% $1.79
> #5076 Save 11% $24.52
> #5076 Save 11% $10.89
> #4138 Minwax Clear Quarts $3.00
> #4556 Save 11% $0.22
> #4035 Lloyds St Louis BBQ Ribs $2.00
> #4183 All-Purpose Paint Brush $5.29
> #5086 Save 11 % $2.20
>
> These rebates were paid to you on 01/11/17 check #6143346096 for $137.61. This check was redeemed on 02/06/17 at Menard's Bismarck, ND.

*See* Boland Decl. Ex. 22 at P000055. In response, Fetsch admitted that all of these rebates were properly issued: "MJ. *Yes I did get those rebates that you worked on for me*." *Id*. at P000054 (emphasis added).

Not only did plaintiffs' counsel, who had Fetsch's documents, know all of this, but they took affirmative steps to hide the truth from Menards. After receiving Fetsch's initial document production, Menards internally questioned why it included copies of original rebate receipts

20

when those receipts were required to be submitted to Menards to obtain a rebate. Boland Decl.

¶ 8. As a result, after Menards served notices for plaintiffs' respective depositions, Menards

made a specific request to inspect the originals of documents plaintiffs produced in discovery.

Boland Decl. Ex. 23.

Plaintiffs' counsel balked. Boland Decl. Ex. 24. at 23. In a series of emails, counsel

professed unawareness of Rule 34's terms or Menards' right to inspect documents, and

repeatedly tried to talk Menards out of its request, offering instead to provide only "better scans."

*Id*. at 19-23. Suspicious of counsel's motives, Menards responded, making crystal clear that

Menards wanted to inspect the originals of whatever transaction and rebate receipts plaintiffs

had:

> On the documents, we appreciate the offer of better scans but we still need to
> inspect the originals that the plaintiffs have in their possession. It is not all
> documents; just the transaction receipts and rebate receipts. We suggested a fairly
> easy solution to this. We can inspect these at your office in Chicago. Frankly, the
> continued reluctance to simply permit Menards to inspect the originals is raising
> even more concerns about plaintiffs.

*Id.* at 19.

Counsel responded that all plaintiffs, including Fetsch, had sent the original receipts to

Menards and therefore no longer had them:

> It seems we may have a bit of a misunderstanding as it pertains to the in-person
> inspection of documents. To be clear, none of our clients have "original" receipts
> or rebate slips in their possession as it pertains to the 11% off everything sale as
> those were sent to Menards in accordance with the rebate program's terms and
> conditions. See, e.g., https://www.menards.com/main/help-center/pricing-
> payments/c-19285.htm ("Only the original Sales Receipt showing purchase of
> qualified items will be honored. Original sales receipts that have been altered in
> any way will not be honored.").[8]

---

[8] Counsel's statement about the "rebate program's terms and conditions" was not true, as original transaction receipts are not submitted in connection with the 11% Off Everything* rebates. The citation to Menards' website is to the page addressing the 11% Price Adjustment program, not the 11% Off Everything* program.

*Id*. at 17 (emphasis added).  More emails from plaintiffs' counsel followed, in which they tried to allay Menards suspicions by repeatedly representing that Fetsch did not have the original rebate receipts because he had sent them to Menards.  *Id*. at 1-10.

As Fetsch later confirmed at his deposition, none of this was true.  Fetsch had ***not*** sent the original rebate receipts to Menards as plaintiffs' counsel had alleged and represented.  Indeed, Fetsch testified that the reason he no longer had the original rebate receipts is because he had destroyed them once he had received the proper rebates – the very rebates plaintiffs' counsel alleged he had been denied – ***not*** because he had sent them to Menards as required by the terms of the sale.  Boland Decl. Ex. 2 at 232:11-233:3.

In sum, plaintiffs' counsel knew two things that doomed Fetsch's claims long before they dismissed them:  (1) Fetsch had not sent Menards the original rebate receipts, meaning he had not complied with the conditions precedent to obtain the 11% rebates, and (2) Menards, nonetheless, sent him all of the rebates which he claimed he had not received.

### 3.  Chris Jesse

Like Earls and Fetsch, Jesse's allegations about his own transactions with Menards were also false.  Far from breaching any contracts, the record demonstrated that Jesse received and redeemed not only the rebate he alleged Menards denied him, but 156 others as well.

In the original complaint, Jesse alleged that he purchased certain products from Menards in Antigo, Wisconsin on August 23, 2017 for $2,825.35 during an 11% rebate sale.  Dkt. 1 at ¶¶ 168-169.  Jesse further alleged that he submitted a "rebate coupon" to Menards, waited over six-to-eight weeks, but never received his rebate for approximately $310.  *Id*. at ¶ 173.

In the amended complaint, after alleging that he saw a Menards' 11% Off Everything sale ad on social media in November 2017 (Dkt. 27 at ¶ 156), Jesse alleged that he purchased the same products from the same store for the same price – only now during an 11% Off

Everything* sale "in mid-November 2017" (*id*. at ¶¶ 158).  Jesse basically then repeated his prior allegations about applying for the rebate, not receiving it, and being denied $310 in rebates.  *Id*. at ¶¶ 161-165.

Jesse was asked to execute declarations attesting to the truth of his factual allegations in the original and amended complaints.  Boland Decl. Ex. 13 at Responses 13 and 16.  Like the others, he refused.  *Id*.

Menards attempted to obtain detailed information about Jesse's alleged transactions with Menards in discovery.  Among the information Menards sought was specific facts about those purchases – exact dates of the purchases, the payment methods (e.g., credit card numbers), etc. – that would help Menards research Jesse's claims.  Boland Decl. Ex. 7 at Interrogatories 3-4. Plaintiffs' counsel refused to provide those details.[9]  *Id*. at Responses at 3-4.

The only document that Jesse produced in discovery was a printout of transactions on his Chase debit card for the period August 1, 2017 to August 31, 2017.  Boland Decl. Ex. 25.  The printout disclosed a transaction similar to the one identified in Jesse's complaints, at the Menards' store in Antigo, Wisconsin, for $2,824.35 ($1.00 less than alleged in the complaints). *Id*. at P000017.  The date of that transaction was August 23, 2017, the date identified in the original complaint.  *Compare id*. *with* Dkt. 1 at ¶¶ 168-69.  At his deposition, Jesse admitted that this was the transaction for which he alleged he was not issued a rebate, not a purchase in "November 2017" as alleged in the amended complaint.  Boland Decl. Ex. 3 at 152:21-156:25.

Moreover, despite alleging (albeit without any basis) that Menards "systematically" denies 11% rebates, Jesse is a prolific Menards' rebate customer.  Between April 4, 2014 and

---

[9] In addition, because Jesse's purchases appeared to have been made for his business rather than himself, Menards also served a subpoena on that business, which was directly relevant to Jesse's standing.  Boland Decl. ¶ 9. Plaintiffs' counsel immediately interjected themselves into that subpoena, interfering with Menards' discovery and threatening Menards with sanctions for even attempting to learn the truth.  *Id*.; Boland Decl. Ex. 46.

November 28, 2017 alone, Jesse applied for, received, and redeemed 157 11% rebates from Menards – including the one forming the basis for his breach of contract claim – often combined into single rebate checks.  Boland Decl. Ex. 26.[10]  As a result, Jesse knew the ins-and-outs and terms of Menards 11% Off Everything* rebate program very well.

Among those terms is that "[f]uture sale price adjustments, exchanges and merchandise returns will void the 11% rebate on the items adjusted, exchanged and/or returned."  *See* Dkt. 1 at ¶ 52; Dkt. 27 at ¶ 48.  Because the amount of a rebate is calculated by Menards' rebate system based on the status of the underlying purchase transaction at the time of processing, any pre-processing "price adjustments, exchanges and merchandise returns" will result in those items being deducted from the pre-tax purchase total for purposes of calculating the final rebate.  Dkt. 68 at 108:21-109:24; Boland Decl. Ex. 27 at Interr. Resp. No. 13.

Menards investigated Jesse's claimed transaction – albeit severely hindered by counsel's refusal to provide details such as credit card numbers, etc. – and produced the related transaction documents to his counsel on November 24, 2020.  Boland Decl. ¶ 11.  A simple review of those transaction records revealed the following, ***which Jesse did not dispute at his deposition***:

- On August 23, 2017, Jesse bought a number of products.  Boland Decl. Ex. 28.  The total before tax was $2,677.16, and the after tax total, as noted above, was $2,824.35.  *Id.* at MENARDS-EARLS_0006429.  Based on the transaction as it existed that day, the 11% rebate would have been $294.49 ($2,677.16 x .11).

- Jesse returned two of the items he purchased, one the next day and the second months later, on December 4, 2017.  *Id.* at MENARDS-EARLS_0006430 ("Related Returns").  The first return, on August 24, 2107, resulted in a price adjustment on the "ARABELLA 1H PULLDOWN" product, a faucet.  Boland Decl. Ex. 29.  The original price was $248.00 and the re-purchase price was $199.00.  *Id.*  Per Menards'

---

[10] Boland Decl. Ex. 26 is an extract from documents/data Menards produced to plaintiffs listing each and every 11% Off Everything* rebate Menards issued from February 1, 2014 to December 3, 2017 (plaintiffs' proposed class period).  Boland Decl. ¶ 10.  This data was produced to plaintiffs' counsel on November 27, 2020.  *Id.*  Boland Decl. Ex. 26 merely identifies the rebates associated with Jesse's address.  *Id.*

policy, Jesse received a merchandise credit check for the $49.00 difference, plus tax ($51.69). *Id.*

- Under the terms of the 11% rebate sale, Jesse's August 24, 2017 price adjustment voided the 11% rebate on the $248.00 faucet. Boland Decl. Ex. 3 at 117:25-118:10.[11] Because the price adjustment occurred before Jesse's 11% rebate was processed, the pre-tax total of his August 23, 2017 transaction was reduced by $248.00, making it $2,429.16 at the time of processing. *Id.* at 178:15-23. Accordingly, the 11% rebate on that purchase after the price adjustment was $267.21 ($2,429.16 x .11 = $267.21). *Id.* at 178:24-179:1.

- And $267.21 is precisely the rebate amount that Menards issued to Jesse in connection with this purchase. Boland Decl. Ex. 26 at Line 131; Boland Decl. Ex. 3 at 181:15-182:5.

As an experienced Menards' rebate customer, Jesse knew that he could submit multiple rebate submissions (rebate forms and original rebate receipts) in the same envelope and that these submissions would often be combined into a single rebate merchandise credit check. Boland Decl. Ex. 3 at 184:4-17. That is what happened in this instance. On October 3, 2017, Menards issued merchandise credit check number 6160448497 to Jesse. Boland Decl. Ex. 26 at Line 131. The amount was $448.31. *Id.* Included in this rebate was the $267.21 for Jesse's August 23, 2017 transaction, as well as 7 other 11% rebates:

| Store | Transaction Date | Transaction Number | Rebate Amount |
|-------|------------------|--------------------|---------------|
| 3205 | 08/23/2017 | 1223 | $267.21 |
| 3205 | 08/23/2017 | 7466 | $16.99 |
| 3205 | 08/24/2017 | 1652 | $21.89[12] |
| 3205 | 08/24/2017 | 2233 | $59.28 |
| 3205 | 08/25/2017 | 9656 | $31.07 |
| 3111 | 08/30/2017 | 9648 | $36.44 |
| 3030 | 08/29/2017 | 2055 | $0.55 |
| 4601 | 08/29/2017 | 4601 | $14.88 |
| | | **Total** | **448.31** |

---

[11] *See* Dkt. 27 at ¶ 48 ("Future sale price adjustments, exchanges and merchandise returns will void the 11% rebate on the items adjusted, exchanged and/or returned.") (quoting program terms and conditions).

[12] This rebate was the 11% Off Everything rebate on the faucet for which Jesse obtained a price adjustment (Boland Decl. Ex. 29, based on the adjusted prices of $199.00 ($199.00 * 11% = $21.89).

Boland Decl. Ex. 26; Boland Decl. Ex. 30.[13]   When deposed, Jesse did not dispute that he received the proper rebate for his purchases on August 23, 2017, taking returns into account, or that he or someone with his permission fully redeemed this rebate thereafter.  *Id*.; Boland Decl. Ex. 3 at 214:21-215:6, 218:25-220:9.

In sum, based on apparently nothing more than a printout of Jesse's Chase debit card transactions and their desire to assert a class action against Menards, plaintiffs' counsel filed claims falsely alleging that Menards had cheated Jesse out of a rebate.[14]

### 4.   Steve Schussler

In the original complaint, Schussler alleged that he purchased wood deck from Menards on September 9, 2017 for $3,429.09 during an 11% rebate sale.  Dkt 1 at ¶ 68.  Schussler alleged that he submitted the "rebate coupon" to Menards "shortly thereafter," but "never received a rebate."  *Id*. at ¶¶ 70-71.  As a result, Schussler alleged that he was "denied . . . $377.20 in rebates to which he was entitled."  *Id.* at ¶ 73.  The amended complaint contained the same allegations, but added certain details, including that Schussler had submitted original rebate receipts with his submissions and that Menards' 11% rebate advertising "factored into" his purchase decision. Dkt. 27 at ¶¶ 89-95.

---

[13] Jesse admitted that he made all of the other purchases.  Boland Decl. Ex. 3 at 189:8-205:7; *see also* Boland Decl. Exs. 31-36.

[14] Indeed, the evidence reveals that counsel, among other things, apparently took steps to hide the truth.  Counsel engaged an expert, Mickey Ferri, to provide a report in support of plaintiffs' motion for class certification. Dkt. 65.  One of the things Ferri did was purport to calculate damages for each of the named plaintiffs.  But rather than give him the underlying data that Menards produced detailing all of the rebates Menards issued during the class period – including the rebate for Jesse's August 23, 2017 transaction – counsel instead had the expert calculate Jesse's purported damages based solely on the allegations of the first amended complaint, which contained the incorrect purchase date.  *Id*. at ¶ 54(a), Attachment B-1 and Table 1.  Based on the expert's "Materials Considered or Relied Upon," counsel did not give the expert either the original complaint, which contained the correct purchase date, or the underlying data Menards produced detailing Jesse's issued – and redeemed – rebate for that purchase.  *Id*. at Attachment A-2.  As a result, Ferri calculated damages for Jesse as if he was cheated out of a rebate based on an alleged purchase in November 2017, when counsel knew that was not true.  In response to Menards' second motion to dismiss, counsel specifically reported that the change to the "November 2017" date for Jesse's purchase in the amended complaint was a "scrivener's error" that would be corrected.  Dkt. 35 at fn. 1.  It never was, and counsel never told their expert the truth.

Like the other plaintiffs, Schussler refused to execute declarations attesting to the truthfulness of his factual allegations. Boland Decl. Ex. 15 at Responses 13 and 16.. This was no doubt because Schussler's allegations were not even close to being true.

Schussler produced only one document in this lawsuit: a single-page printout of transaction detail for his Discover® card, which identifies a $3,429.09 charge at Menards on September 9, 2017. Boland Decl. ¶ 12; Boland Decl. Ex. 37. This document, apparently, was the sole evidentiary basis for Schussler's allegations about both the amount of his purchase that day and the amount of the 11% rebate he alleged he was denied ($3,429.09 x .11 = $377.20).

In truth, Schussler's September 9, 2017 purchase was for $5,430.09, not $3,429.09. Boland Decl. Ex. 38. The pre-tax amount was $4,944.54, which included a delivery charge of $89.00.[15] *Id.* at 2. Three different tenders were used: one of these was Schussler's Discover® card, which was charged $3,429.09; another $2,000.00 was charged to Schussler's Menards' credit card; and an additional $1.00 was charged to MasterCard in the name of Kevin Kelly. *Id.* at 6-7.

Schussler applied for an 11% rebate on the pre-tax amount of the total purchase, which was $4,855.54, after deducting the non-qualifying delivery charge. *Id.* at 2, 6; Boland Decl. Ex. 39. As of the date of the transaction, the 11% rebate would have been $534.11 ($4,855.54 x .11 = $534.11). Boland Decl. Ex. 39. But there were returns. Items totaling $511.04 were returned on (i) September 21, 2017 ($136.58, pre-tax), (ii) September 25, 2017 ($359.44, pre-tax), and (iii) September 27, 2017 ($15.92, pre-tax). Boland Decl. Group Ex. 40. After accounting for

---

[15] Delivery charges are not eligible for an 11% Off Everything* rebate. Dkt. 27 ¶ 48 ("Excludes event tickets, gift cards, propane purchases, delivery and handling charges, all rental items, minuteKEY®, processing fees, packaging charges and extended service agreements.") (quoting program terms and conditions).

these returns, the pre-tax amount of Schussler's purchase was $4,344.50, and the 11% rebate amount was $477.95 ($4,355.50 x .11 = $477.95).

That is precisely the rebate amount issued to Schussler in rebate check #6163694211 on November 15, 2017.  Boland Decl. Ex. 41. And that rebate was redeemed ten days later, on November 25, 2017.  *Id.*  Like the others, Schussler had no factual basis for any of his claims against Menards.

### 5.    Trent Shores

In the original complaint, Shores alleged that he made two purchases from Menards in Galesburg, Illinois: (i) siding purchased on July 12, 2017 for $3,850.75; and (ii) a dishwasher purchased "in or about November 2017" for "approximately $700."  Dkt. 1 at ¶¶ 74, 78-79. Shores alleged that both of these purchases were "during a Menards 11% Off Everything sale." *Id.* at ¶¶ 74, 78.  Shores alleged that he did not receive a rebate for either, and was denied $500.58 in rebates.  *Id*. at ¶¶ 77, 82, 85.

Shores' failure to allege that he complied with the conditions precedent and failure to allege causation were a focus of Menards' first motion to dismiss.  As with other plaintiffs, counsel vigorously opposed Menards' motion, arguing that all plaintiffs had adequately alleged satisfaction of the condition precedent – mailing both a completed rebate form and original rebate receipt to Menards – as well as causation.  Dkt. 18 at 9-11.  In the amended complaint, counsel continued to press the same allegations about Shores (Dkt. 27 at ¶¶ 96-109), and added, among other things, a specific allegation that Shores had filled out the rebate form and included it "and the original rebate receipts" in the envelope that he sent to Menards (*id*. at ¶ 105).

In discovery, Shores too was asked to execute declarations attesting to the accuracy of his factual allegations and refused.  Boland Decl. Ex. 16 at Responses 13 and 16.  Like the others, Shores allegations were false.

Shores produced no documents to support his alleged second purchase of a dishwasher in November 2017.  Nor could Menards locate any transaction or rebate submission records for such a purchase.  Boland Decl. ¶ 13.  Menards has researched its sales records, and only two dishwashers were sold from its store in Galesburg, Illinois in November 2017.  *Id*.  Neither of these was purchased by Shores.  *Id*.

Shores did produce the transaction receipt for his siding purchase, which was a special order.  Boland Decl. Ex. 42.  That receipt confirms that the purchase was on July 12, 2017, as Shores alleged.  But, as the receipt also confirms, there was no 11% Off Everything* rebate running that day.  *Id*.  Menards only ran one 11% Off Everything* rebate sale that month, from July 16, 2017 through July 22, 2017.  Boland Decl. Ex. 18 at 3 of 6.  Shores' July 12, 2017 siding purchase was not made during an 11% Off Everything* rebate sale.  Boland Decl Exs. 18, 42.  Thus, his allegations and his counsel's argument that (1) he had purchased during an 11% Off Everything* rebate sale, (2) had submitted a rebate form and rebate receipt, and (3) Menard's advertisement for an 11% rebate factored into his buying decision, were all false.

Just as with Fetsch, counsel tried to hide the facts about Shores.  In response to Menards' request to inspect original receipts, counsel told Menards on February 11, 2021 that, with respect to the copy of Shores' July 12, 2017 receipt that he produced (Boland Decl. Ex. 43, P000067-68), "This is a photo of an original receipt that was subsequently sent to Menards.  Plaintiff does not have the original receipt."  Boland Decl. Ex. 24 at 15.  That, of course, was not true as original transaction receipts are not submitted in connection with the 11% Off Everything* rebate program and no 11% Off Everything* rebate was running on July 12, 2017.  But counsel knew that wasn't true.  An additional copy of that same receipt photographed against a totally different background (*i.e.,* one of the "better scans" counsel produced) was provided to Menards

on January 28, 2021 (years after the purchase and any alleged "submission" of the receipt to Menards). *Compare* Boland Decl. Ex. 43, P000067-68 (original copy produced on November 4, 2020) *with* Boland Decl. Ex. 42, P000081 (second copy produced on January 28, 2021).

**6.    Cassie Lietaert**

Cassie Lietaert is another plaintiff who never should have filed claims in the first instance, based on the factual allegations she made.   Her own allegations, confirmed by Menards' records, show that Menards issued Lietaert the very rebate she claims she was denied – and that she knew it.

In both complaints, Lietaert alleged that she purchased a refrigerator for $956.71 from a Menards store in Traverse City, Michigan, in September 2017.  Dkt. 1 at ¶¶ 113-14; Dkt. 27 at ¶¶ 136-38.  She alleged that she submitted rebate paperwork to Menards within a week of the purchase, waited beyond the six-to-eight week period for rebate processing, but still had not received a rebate.  Dkt. 1 at ¶ 117; Dkt. 27 at ¶¶ 140-41.

Here is where Lietaert's own allegations defeat her claims.  Lietaert specifically alleges that she checked on her rebate via the Rebates International on-line rebate tracker, and discovered that her rebate had, in fact, been issued, but she had simply not received it.  Dkt. 1 at ¶ 117; Dkt. 27 at ¶ 142.  In other words, Lietaert – and her lawyers – knew that Menards had done everything that it was required to do under the rebate program:  it issued Lietaert the proper rebate after receiving Lietaert's rebate form and rebate receipt.

And if that wasn't clear from just Lietaert's own allegations, the documents Menards produced in discovery in November 2020 confirmed these facts.  Lietaert's purchase was on September 2, 2017.  Boland Decl. Ex. 44.  Although the total amount of that transaction with tax was $956.71, the pre-tax amount – on which the 11% rebate is calculated – was $902.56.  *Id*. The 11% rebate on this transaction was $99.28 and, as Lietaert knew before she filed her claims

30

and as Menards' records confirm, Menards issued this rebate on October 27, 2017 for exactly that amount, as part of rebate check #6162315389.  Boland Decl. Ex. 45.  While it is unfortunate that Lietaert's rebate check was either lost in the mail or mishandled by Lietaert (Menards did not get to take her deposition to find out), that does not change the fact that Lietaert and her lawyers have long known that Menards sent her the rebate she claimed Menards had denied.

## ARGUMENT

As Judge Easterbrook observed over 25 years ago:

> Lawyers sometimes file first and think later.  This may impose on the other party the costs of deciphering the pleading, running down the cases, informing the court, and putting things right.  One of the premises of the legal system, however, is that each party should bear its own expenses and not fob them off on the other side.

*In re TCI Ltd.*, 869 F.2d 441, 442 (7th Cir. 1985).  As Judge Easterbrook held, one remedy for this can be found in 28 U.S.C. § 1927.  *Id*. at 446.

Under section 1927, "[a]ny attorney or other person admitted to conduct cases in any court of the United States . . .who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."  The statute is designed "to compensate the party that has been injured by a lawyer's bad-faith conduct and to compel the lawyer to bear the costs of his own lack of care."  *Tillman v. New Line Cinema*, 374 Fed. Appx. 664, 666-67 (7th Cir. 2010).

As the Seventh Circuit has explained, the term "'[b]ad faith' sounds like a subjective inquiry," but "has an objective meaning as well as a subjective one."  *In re TCI Ltd.*, 769 F.2d at 445; *see also Boyer v. BNSF Ry. Co*., 824 F.3d 694, 708 (7th Cir. 2016) ("A finding of subjective bad faith on the part of the offending attorney will support imposition of sanctions under section 1927, but such a finding is not necessary; 'objective bad faith' will also support a sanctions

31

award."). "Subjective bad faith or malice is important only when the suit is objectively colorable." *In re TCI Ltd.*, 769 F.2d at 445. Sanctions are also appropriate under Section 1927 when:

> [A]n attorney has acted in an "objectively unreasonable manner" by engaging in "serious and studied disregard for the orderly process of justice," *Pacific Dunlop Holdings, Inc. v. Barosh*, 22 F.3d 113, 119 (7th Cir.1994); pursued a claim that is "without a plausible legal or factual basis and lacking in justification," *id.*; or "pursue[d] a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound," *Kapco Mfg. Co. v. C & O Enters., Inc.,* 886 F.2d 1485, 1491 (7th Cir.1989).

*Jolly Grp., Ltd. v. Medline Indus., Inc.*, 435 F.3d 717, 720 (7th Cir. 2006). Thus, "[i]f a lawyer pursues a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound," the conduct is objectively unreasonable and vexatious. *In re TCI Ltd.*, 769 F.2d at 445.

## I.     PLAINTIFFS' COUNSEL UNREASONABLY AND VEXATIOUSLY MULTIPLIED THESE PROCEEDINGS

Here, plaintiffs' counsel – those from Tycko & Zavareei LLP and Benesch, Friedlander, Coplan & Arnoff LLP – clearly, unreasonably and vexatiously multiplied the proceedings in this case.[16]

One of the most basic and elementary obligations that a lawyer has is to "ascertain the facts and review the law to determine whether the facts fit within a recognized entitlement to relief." *In re TCI Ltd.,* 769 F.2d at 446; *see also Colorado Chiropractic Council v. Porter Mem'l Hosp.*, 650 F. Supp. 231, 239 (D. Colo. 1986) ("[A]ttorneys have an obligation to make reasonable inquiry into both the law and the facts surrounding their clients' disputes prior to

---

[16] Menards specifically does not seek sanctions against plaintiffs' local counsel from Atterbury, Kammer & Haag, S.C.  Unlike Tycko and Benesch, whose lawyers have been involved in concocting this ill-conceived case from the plaintiff-solicitation phase, Menards has no reason to believe that counsel from the Atterbury firm had any hand in the misconduct Menards has uncovered.  Instead, it appears that the firm and its lawyers acted simply as local counsel, nothing more.

initiating a lawsuit. This obligation is imposed not only by Rule 11 and 28 U.S.C. § 1927, but also by the ethical obligations of the legal profession").  Without question, plaintiffs' counsel violated this basic obligation.

As demonstrated above, plaintiffs' counsel either knew – or should have known if they had exercised even a minimal degree of diligence – that the claims asserted by the named plaintiffs were factually baseless.  They began by asserting claims on behalf of six individuals who were clearly subject to a binding arbitration clause, without even acknowledging this fact in the complaint or otherwise including allegations about why that clause did not or should not apply.  *See, e.g.*, *Hunt v. Moore Brothers, Inc.*, 861 F.3d 655, 657-58 (7th Cir. 2017) (section 1927 applied where counsel filed complaints disregarding a binding arbitration clause).

And, as set forth in detail above, counsel continued to press this case forward even though the remaining plaintiffs had no factual basis to sue Menards in the first place.  In their zeal to pursue a class action, counsel unreasonably and vexatiously multiplied these proceedings by among other things:

- filing the original complaint with factually false allegations about the plaintiffs;

- opposing Menard's first motion to dismiss, arguing, among other things, that all plaintiffs  had satisfied the conditions precedent and that Menards' advertisements proximately caused their alleged losses;

- filing an amended complaint, repeating the factually false allegations about plaintiffs and adding additional false allegations to shore up their contract and consumer fraud claims;

- opposing Menards' second motion to dismiss, again defending their consumer fraud claims on causation grounds;

- fighting Menards' efforts to obtain specific purchase and transaction information that would allow Menards to investigate plaintiffs' claims;

- making numerous misrepresentations about plaintiffs' original transaction documents when Menards' sought to inspect these;

- forcing Menards to produce large amounts of documents and data and produce witnesses for depositions;

- filing a motion for class certification, with plaintiffs as proposed class representatives, and submitting a report form a proposed expert; and

- continuing to pursue discovery and other relief from Menards up to the time they finally dismissed the case.

These actions violated section 1927.  *See e.g., See Baker v. Am. Juice, Inc.*, 870 F. Supp. 878, 884 (N.D. Ind. 1994) (section 1927 violated where there was no factual basis for claim and counsel "either did not bother to conduct the research required to make this determination or else did not conduct his research in an objectively reasonable manner"); *Fusco v. Medeiros*, 965 F. Supp. 230, 255–56 (D.R.I. 1996) (section 1927 violated when plaintiff's claims were not well grounded in fact and plaintiff's attorney vexatiously multiplied proceedings through class action allegations, among other violations).

In addition, plaintiffs' counsel violated their duty of candor to this Court when they misrepresented the circumstances giving rise to dismissal.  In that motion, plaintiffs' counsel told the Court that:

> Here, as a result of Menards' recent document production and the deposition of several of the named Plaintiffs it is evident that, while there was little to no visibility into Menards' rebate program previously, these Plaintiffs cannot adequately represent the proposed class. There has been absolutely no bad faith on the part of Plaintiffs or their counsel; they conducted a thorough pre-suit investigation, aggressively but fairly litigated the case, withstanding two motions to dismiss and opposing a motion to compel arbitration, and are now voluntarily dismissing at the first opportunity after learning of the facts that necessitate this motion. Plaintiffs are also moving the court to voluntarily dismiss with prejudice now in order to save Defendant the need to oppose Plaintiffs' class certification motion and various discovery motions.

Dkt. 92 at p. 2-3.

As Menards pointed out in response – and as demonstrated in detail above – that was simply not true.  Dkt. 93.  Dismissal of the case was "not warranted because of any new facts or

34

information coming to light from Menards in the discovery process." *Id*. at ¶ 10.  The case was dismissed "because the plaintiffs' allegations ***about themselves*** were false."  *Id*. (emphasis added).

As the facts set forth above also confirm, counsel's representations that there was no "bad faith" on the part of counsel and that counsel had "conducted a thorough pre-suit investigation" were patently false.  To the contrary, Menards' investigation and discovery revealed that the exact opposite was true.  Indeed, the proof is in the pudding; as a result of plaintiffs' dismissal with prejudice, not a single claim in their 247-paragraph, 7-count amended complaint survived, because there was no factual basis for any of them in the first place.

Simply put, from the start this case was nothing more than a lawyer-concocted class action pursued without regard for the actual facts regarding the very plaintiffs on whose behalf the claims were asserted.[17]  Again, as Judge Easterbrook explained two decades ago:

> Unless attorneys learn from experience, § 1927 will not achieve its purpose. The bar of this circuit must be aware that the courts will enforce § 1927 and Rule 11. Litigation must be grounded in an objectively reasonable view of the facts and the law. If it is not, the lawyer who proceeds recklessly – not his innocent adversaries – must foot the bill.

*In re TCI Ltd.,* 769 F.2d at 450.  That is the case here.

## II.   PLAINTIFFS' COUNSEL SHOULD BE ORDERED TO PAY THE COSTS AND FEES MENARDS' NEEDLESSLY INCURRED

Menards has incurred significant costs and fees defending against the baseless claims counsel vexatiously and unreasonably pursued.  Indeed, as explained above, this case lacked a factual basis from the very start – nearly one half of the original named plaintiffs were not proper

---

[17] Plaintiffs' motion for dismissal admits as much.  In that motion, counsel contended that dismissal was warranted because "these Plaintiffs cannot adequately represent the proposed class." Dkt. 92 at 2.  But if that were indeed the only thing counsel had uncovered it would not mandate dismissal, just withdrawal of the motion for class certification.  The fact that counsel chose to dismiss the entire case – all plaintiff's claims, ***with prejudice*** – proves that this case was never about the rights or claims of any plaintiffs.  It was about the lawyers' quest to pursue a class action, pure and simple.

plaintiffs at all because of their binding arbitration clauses and the remaining plaintiffs had no factual basis to sue Menards.   Any reasonably diligent investigation by counsel would have disclosed both of these things and put the brakes on this lawsuit before it was ever filed. Plaintiffs' counsel unreasonable and vexatious conduct began with the original complaint, and every penny Menards' has spent was unnecessary and unwarranted. *See In re TCI Ltd.*, 769 F.2d at 448 (under section 1927 court has "the authority to award fees incurred right from the very beginning").

But just as importantly, counsel's obligation to investigate the facts is a continuing one, as is counsel's obligation to dismiss a case when it is clear that it lacks a factual or legal basis. *Jolly Grp., Ltd.*, 435 F.3d at 720 (Section 1927 "impos[es] a continuing duty to dismiss claims that are no longer viable").   Here, counsel had ample opportunity throughout this case to do so.

Menards' first motion to dismiss, for example, specifically raised the issues of plaintiffs' compliance with the terms and conditions of the 11% Off Everything* rebate program and whether any allegedly false or misleading Menards' advertisement proximately caused plaintiff's damages.   This motion, in turn, should have, at minimum, prompted counsel to revisit each of these specific issues with each of the plaintiffs to confirm the facts.   Had they bothered to do so, they would have recognized (to the extent they did not already know) that Earls and Shores, for example, had not even made relevant purchases during an 11% Off Everything* sale and, as a consequence, could not have complied with the conditions precedent or have been damaged by any false 11% Off Everything* ads.   Counsel would have also recognized (again, to the extent they did not already know) that Fetsch did not comply with the terms and conditions because he sent Menards his original transaction receipts, not the original rebate receipts.

In addition, if counsel did not make such an inquiry before responding to Menards' motion, they absolutely should have done so before amending their claims to include the additional factual allegations about compliance with the conditions precedent and causation. These inquiries, of course, should have been made for each and every plaintiff and, given that counsel dismissed *all* plaintiffs' claims with prejudice, these inquiries would necessarily have ended this case for everyone.

But apparently, counsel did not do so.  As a result, all of the costs and fees Menards' incurred after the Court ruled on Menards' motion were needless incurred as a result of counsel's objective bad faith.

Nor did counsel otherwise continue to investigate the factual merits of plaintiffs' allegations as discovery proceeded.  Menards served its first document request and interrogatories on all plaintiffs on August 15, 2020, based on the original complaint, and served second requests and interrogatories on the remaining plaintiffs on September 21, 2020, based on the amended complaint.  Boland Decl. ¶ 4.  Responding to these requests clearly gave counsel another opportunity to conduct a detailed investigation and inquiry. But, as explained above, rather than do so, counsel instead chose to object, obstruct and, ultimately, misrepresent facts to Menards.

But counsel had even more chances to make things right.  Menards produced extensive documents and data to counsel in November 2020.  These documents and data, if properly reviewed and analyzed, confirmed that these plaintiffs' allegations about themselves were baseless – as established in the depositions of the three plaintiffs Menards was able to depose before plaintiffs folded their tents.  Menards' data confirms that Jesse, Schussler, Fetsch and Lietaert were all issued proper rebates on the transactions they identified in the complaints.  Even

if counsel was permitted to rely on Menards to disprove their clients' false allegations about themselves (and they clearly are not), Menards gave plaintiffs the documents and data that did so more than three months before counsel finally dismissed the case.

In sum, from the beginning of this case and at each step along the way, Menards has been forced to incur costs and fees that it should never have had to bear.  It was plaintiffs' counsel's obligation to ascertain the facts and the law in the first instance, not Menards' burden to disprove plaintiffs' allegations:

> The principle underlying § 1927, Rule 11, and the bad faith exception to the American Rule is that in a system requiring each party to bear its own fees and costs, courts will ensure that each party really does bear the costs and does not foist expenses off on its adversaries. One cost of a lawsuit is research. An attorney must ascertain the facts and review the law to determine whether the facts fit within a recognized entitlement to relief. This may be a costly endeavor. Defense against a colorable claim also may be very costly. It would warp the system if a lawyer for a would-be claimant could simply file a complaint and require the adversary to do both the basic research to identify the claim and then the further work needed to craft a response. Suits are easy to file and hard to defend.

*In re TCI Ltd.*, 769 F.2d at 444.  Plaintiffs' counsel – those at Tycko and Benesch – should be ordered to pay the costs and fees Menards incurred as a result of their conduct.

## <u>CONCLUSION</u>

For all of the foregoing reasons, Menards' motion should be granted, and Menards should be allowed to submit an appropriate affidavit supporting its request for the costs and fees it incurred as a result of counsel's conduct.[18]

Dated: April 19, 2021                    Respectfully submitted,

*s/ James J. Boland*
Brian P. Norton, IL Bar No. 6186737
James J. Boland, IL Bar No. 6228874
Andrew C. Nordahl, IL Bar No. 6226999
Freeborn & Peters LLP
311 South Wacker Drive, Suite 3000
Chicago, Illinois 60601-6677
Tel: (312) 360-6000
Fax: (312) 360-6520
bnorton@freeborn.com
jboland@freeborn.com
anordahl@freeborn.com

*Attorneys for defendant Menard, Inc.*

---

[18] *See, e.g., Hunt v. Moore Bros., Inc.,* 2016 WL 9454071, at *5 (S.D. Ill. Feb. 5, 2016) (granting movant's request for sanctions under Section 1927 and ordering the movant to then, "within fourteen (14) days of this Order, file an affidavit detailing attorney's fees incurred..."), *aff'd,* 861 F.3d 655 (7th Cir. 2017); *Scheidler v. United Wisconsin Ins. Co.*, 2001 WL 34382022, at *11 (W.D. Wis. Sept. 9, 2001) (giving the moving party one month to submit an itemized statement of attorney's fees following the court's finding that the party was entitled to reasonable attorney's fees).