**TYCKO & ZAVAREEI LLP**
Sabita J. Soneji (*admitted pro hac vice*)
Mallory Morales (*admitted pro hac vice*)
1970 Broadway, Suite 1070
Oakland, CA 94612
(510) 254-6808
Fax: (202) 973-0950
ssoneji@tzlegal.com
mmorales@tzlegal.com

David S. Almeida
Suzanne M. Alton de Eraso *(admitted pro hac vice)*
Matthew J. Langley *(admitted pro hac vice)*
**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**
71 S. Wacker Dr., Suite 1600
Chicago, IL 60622
(312) 212-4979
Fax: (312) 767-9192
dalmeida@beneschlaw.com
saltondeeraso@beneschlaw.com
mlangley@beneschlaw.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| BARRY EARLS, THOMAS FETSCH, DAVID KIEL, TRENT SHORES, STEVE SCHUSSLER, CASSIE LIETAERT and CHRIS JESSE, *individually and on behalf of a class of similarly situated individuals*, <br><br> Plaintiffs, <br><br> v. <br><br> MENARD, INC., a Wisconsin corporation, and JOHN DOES 1-10, <br><br> Defendants. | Case No. 20-CV-107 <br><br><br><br> Judge: Hon. James D. Peterson <br><br> **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO MENARD, INC.'S MOTION FOR SANCTIONS** |

Plaintiffs Barry Earls, Thomas Fetsch, David Kiel, Trent Shores, Steve Schussler, Cassie Lietaert and Chris Jessie (collectively, "Plaintiffs"), by and through undersigned counsel, in response and opposition to Defendant Menard, Inc.'s Motion for Sanctions Pursuant to 28 U.S.C. § 1927 (the "Motion"), respectfully state as follows:

## INTRODUCTION

While Menards has certainly taken the mantra that "the best defense is a good offense" to heart, it has lamentably taken no steps to ensure that its litigation tactics are not merely offensive. Menards intentionally prolonged this litigation by withholding the evidence that revealed that five Plaintiffs may have received their rebates and therefore may not be able to pursue claims alleging that Menards fails to provide earned rebates in a consistent and transparent way. But Menards has never proven that all the remaining class members' claims, which are still live, are false or without good faith. Indeed, they cannot. Nevertheless, Menards now seeks its fees *for the entirety of this litigation*, brazenly contending that Plaintiffs' investigation and allegations are, to use the parlance of the day, a "hoax." Menards' Motion, full of sound and fury, nevertheless does not come close to the high bar necessary to justify imposition of sanctions under these circumstances where Plaintiffs sought to vindicate their consumer rights in good faith and the named Plaintiffs remaining in this suit dismissed their claims as soon as they learned they may lack standing to pursue them.

Over two years, counsel for Plaintiffs investigated a pervasive and widely-reported problem with Menards' 11% Off Everything rebate program. Counsel received several hundred inquiries from Menards' customers trying to understand why they had not received their rebates at all or, if they had, why the amount differed from what was anticipated. Counsel conducted a thorough, multi-year investigation, vetting the claims of hundreds of individuals seeking representation and conducting one-on-one interviews and reviewing any available rebate

documentation.[1]   Counsel prepared, with Plaintiffs' input and approval, and filed a multi-count complaint asserting common law and statutory claims on behalf of consumers from several Midwestern states. [Dkt. No. 1.] Plaintiffs' claims mirror those of thousands of online complaints submitted by similarly-situated consumers, multiple inquiries by the Better Business Bureau, and another pending class action in Milwaukee challenging other misleading aspects of Menards' rebate program.

Menards moved twice to dismiss Plaintiffs' pleadings. Both attempts failed.[2] Before the Court settled the pleadings, Plaintiffs served initial discovery requests and then spent several months meeting and conferring with Menards' counsel, serving supplemental document requests, and ultimately moving to compel relevant information concerning Menards' calculations of the 11% Off Everything rebate checks to consumers during the relevant timeframe. Plaintiffs' counsel investigated and pursued Plaintiffs' claims appropriately and reasonably.

Menards, on the other hand, did not behave reasonably. Rather than meeting and conferring with Plaintiffs' counsel about the transaction records for Plaintiffs or providing

---

[1]   Although Menards repeatedly suggests there was impropriety, Plaintiffs and their counsel never tried to "hide the truth" and instead produced all available documentation regarding their purchases. Given that Menards requires its customers to submit the original documentation, it should be unsurprising to Menards that Plaintiffs lack original receipts and rebate forms in connection with purchases made several years ago.

[2]   As evidence of Menards' approach to litigation of this matter, Menards went as far as seeking to dismiss Plaintiffs' claims because they included publicly-available "hearsay" statements from other consumers complaining about Menards' administration of its 11% Off Everything rebate program. This Court denied Menards' baseless request for dismissal. [See Dkt. No. 48 at 5 ("Menards also contends that in considering whether plaintiffs have alleged affirmative acts of misrepresentation, the court should disregard quotations that plaintiffs included in their complaint from anonymous internet users who criticized Menards' voucher program. But plaintiffs didn't need the challenged allegations to allege affirmative acts of misrepresentation… [s] Menards' arguments regarding these issues don't warrant dismissal of plaintiffs' consumer-fraud claims, either.").]

evidence that Plaintiffs received the proper rebate amounts, Menards counsel instead chose to obstruct Plaintiffs' discovery requests, repeatedly make *ad hominem* attacks on the named Plaintiffs and their counsel, and file multiple briefs seeking to dismiss the case. In doing so, Menards needlessly prolonged litigation for all parties. In fact, Menards did not share all relevant transactional information about these named Plaintiffs until *after* Plaintiffs moved for class certification, and instead levied threats of Plaintiffs' alleged improper conduct, engaged in discovery tactics seemingly designed to waste time, and attempted to change the sworn testimony of its own corporate witness after depositions.[3]

Menards also did not inform this Court that, on September 16, 2020, its counsel sent a letter alluding to the fact that they were in receipt of Plaintiffs' transaction histories and that they were not entitled to rebates. But in this letter, Menards provided no factual information to Plaintiffs in support of its bald assertion that Plaintiffs should not assert their claims. [*See* Dkt. No. 98 at Ex. 4.] If, as Menards then contended, it had retrieved and reviewed relevant transaction data and determined that Plaintiffs received rebates in the appropriate amounts, then why was such information *not* provided to undersigned counsel until months later? Instead, Menards produced thousands of pages of data in no particular order covering *all of the purchases* Plaintiffs made prior to the start of the class period, but not the specific transactions identified in Plaintiffs' pleadings.

---

[3] Another example of Menards' bad faith in this litigation is that, after this Court granted Plaintiffs' Motion for Voluntary Dismissal, counsel for Menards immediately requested that Plaintiffs' counsel delete all information produced by Menards in accordance with the protective order, and provide a declaration that these productions had been destroyed. Plaintiffs complied with Menards' deletion request and confirmed this deletion to Menards' counsel. As a result, now Plaintiffs lack access to the documents which demonstrate that there was no way to discern from Menards' voluminous, rolling document production whether a particular plaintiff actually received a particular rebate.

Moreover, Menards did not finish producing relevant transactional data until February 2021, *after Plaintiffs moved for class certification and just prior to Plaintiffs' depositions*.[4]

In no way does the dismissal of representative Plaintiffs somehow vindicate Menards' actions or negate thousands of other consumer complaints regarding the administration of Menards' 11% Off Everything rebate program. In fact, Menards' own conduct in discovery underscores Menards' transparency failures. If—as Menards now contends—this lawsuit was unnecessarily prolonged, it was unmistakably as a result of Menards' abject failure to be forthcoming about (frequently requested) information regarding Plaintiffs' rebates and transaction histories. Simply put, Menards cannot, by its needlessly aggressive and wasteful litigation tactics, increase much of the expenses associated with litigating, and then turn around and ask this Court to reward that misbehavior by allowing it to recover the entirety of its fees in a dispute concerning Menards' failure to provide visibility or transparency into its widely-advertised 11% Off Everything rebate program.

As soon as it became clear that Plaintiffs were not the appropriate persons to litigate these issues, undersigned counsel, with client approval, sought leave of this Court to dismiss their claims with prejudice. There is no evidence to suggest that Plaintiffs' or their counsel's conduct in any

---

[4]    Like Plaintiffs, Plaintiffs' counsel spent months trying to understand Menards' Kafkaesque rebate process. To redeem a rebate, a consumer is required to send Menards all of the original paperwork. There is no way to for the consumer to check whether Menards received the mailed paperwork, no way to determine whether Menards denied the rebate upon submission and no way to check whether Menards adjusted the amount of the rebate as submitted or provided the customer with multiple rebates via the same check. While Menards provides customers with an online "rebate tracker," it merely shows the amount of a forthcoming rebate check (if and only if the rebate is processed and approved), not the basis for the calculated rebate. Menards provides no other information about the status of a submitted rebate. Menards even mails its rebates in such a way as to be easily confused with junk mail. Menards' own Rule 30(b)(6) representatives did not have a clear understanding of how its rebate system worked, and consequently Plaintiffs sought to compel an additional deposition.

way prolonged this litigation or that Plaintiffs hid pertinent information from Menards. In fact, conspicuously absent from Menards' Motion is any mention that Menards—despite purportedly having these records and the ability to search them—ever approached counsel for Plaintiffs to inform them that Plaintiffs' eligibility for and amounts of anticipated rebates may have been impacted by:

- the dates the purchases were made (whether subject to an 11% rebate promotion or not);

- any price adjustments or returns (thus changing the amount of the anticipated rebate);

- the fact that additional documentation was needed from the consumer (affecting their eligibility for a rebate);

- whether the rebate check had been mailed (so as to be on the lookout for and not throw it away since it is sent in a junk mailer); and

- whether the rebate check was for multiple purchases and therefore had reimbursed a customer for multiple rebate submissions (thus affecting the anticipated rebate amount).

Rather than seek an orderly and just resolution to this dispute, Menards and its counsel each and every time chose the path of more litigation. As Judge Conley observed in denying a similar sanctions request in *ARcare, Inc. v. American Lifeline, Inc*., "defendant was well within its right to pursue this litigation strategy, but it ran the risk of any requests for shifting of fees and costs falling on deaf ears." Case No. 3:17-cv-00313-wmc, D.I. # 23, at *4 (W.D. Wisc. Nov. 22, 2017). Menards' Motion contends that it is entitled to sanctions in the form of the entirety of its fees because it had to engage in all manner of unnecessary litigation. That is a truly extraordinary request.

Finally, it bears noting that a request for sanctions appears to be a habit for Menards, who in the past decade have filed more than eight sanctions motions against various litigants. It is, in short, how Menards chooses to litigate its cases. Here, Menards and its counsel devised a litigation

strategy designed to foment disagreements, to generate fees, and to personally attack Plaintiffs and their counsel at every turn. Now it brazenly asks this Court to not only approve of its litigation-first strategy but to reward it by allowing it to obtain fees and costs. Menards' Motion should be denied in its entirety.

## RELEVANT PROCEDURAL AND FACTUAL BACKGROUND

**A. Plaintiffs' Counsel Undertook a Multi-Year Investigation and Drafted Pleadings Based on the Findings of that Investigation.**

This lawsuit is the result of hundreds of individuals seeking assistance with respect to the administration of Menards' widely-advertised 11% Off Everything rebate program. Undersigned counsel received several hundred inquiries (and continues to receive them) from Menards' customers hoping to recover rebates that they reasonably believed that they had not received or had received in an amount different from what was anticipated. [*See* Declaration of David Almeida ("Almeida Decl."), ¶ 4.] Counsel conducted a thorough investigation prior to filing its case, vetting the claims of those individuals through one-on-one interviews and a review of any available rebate documentation. [Almeida Decl., ¶ 5.] As detailed in Plaintiffs' allegations, Menards intentionally designed its rebate program to prevent its customers from obtaining relevant information about their rebate submissions. For example, Menards requires consumers to provide original receipts with the rebate submission, fails to acknowledge the receipt of consumers' rebate form submissions on Rebates International's online rebate tracker, fails to inform consumers if their rebate has been denied, fails to provide any explanation as to why a rebate has been rejected, fails to provide phone numbers for customers to inquire about the status of their submitted rebates, and otherwise makes it impossible for customers to determine what happened to their missing rebates. [*See* Dkt. No. 27 ¶¶ 62-69.]

Although Menards and its counsel seeks to portray this case as "lawyer driven," there are *currently* no fewer than 800 consumer complaints concerning Menards' rebate program on the Better Business Bureau website, and Menards was the subject of a Better Business Bureau investigation into the administration of its 11% Off Everything rebate program. [*See* Am. Compl., ¶¶ 21 & 84.][5] Menards chose not to respond to the Better Business Bureau's inquiries. [*See* Almeida Decl., ¶ 10.]

Based on this information, as well as additional research and investigation, undersigned counsel spent several months preparing a comprehensive class action complaint that laid out the difficulties that the representative Plaintiffs experienced in obtaining rebates in the promised amounts, including several Plaintiffs who never received a submitted rebate at all. [*See* Almeida Decl., ¶ 6.] On February 26, 2020, Plaintiffs filed their Complaint alleging that Menards, *inter alia*, breached its contracts and violated state consumer fraud laws by failing to, among other things, honor its contractual commitments to provide rebates in the agreed-upon amounts. [*See* Dkt. No. 1.] The Complaint asserted contractual, quasi-contractual and statutory consumer fraud claims on behalf of representative plaintiffs from several states in which Menards operates. [*Id.*] Each representative Plaintiff reviewed and approved the draft complaint prior to filing. [*See* Almeida Decl. ¶ 8.]

Plaintiffs' Complaint provided information sufficient for Menards to investigate the allegations. Specifically, Plaintiffs detailed the following information in connection with each of their rebate experiences: (i) the date (or at least the month and year) of their purchase(s); (ii) the store where Plaintiffs purchased their items; (iii) the amount of their purchases; (iv) the amount of

---

[5]      Menards' Rule 30(b)(6) witness was not prepared to discuss the Better Business Bureau complaints, and consequently Plaintiffs sought to compel a second deposition. [*See* Dkt. No. 82 at 16.]

rebate to which Plaintiffs believed they were entitled; and (v) the actions the Plaintiff took to redeem the rebate.   [*See* Dkt. No. 1, ¶¶ 60-67; 68-73; 84-85; 86-95; 96-105; 106-112; 113-120; 121-129; 130-140; 141-149; 150-157; 158-167 & 168-173.]   The original Complaint also included the voluminous, publicly-available consumer complaints regarding Menards' administration of its 11% Off Everything rebate program, with links to each consumer complaint.   [*See* Dkt. No. 1, ¶¶ 55-58.]

By Order dated September 4, 2020, the Court denied, in part, and granted, in part, Menards' motion to dismiss the original Complaint.   [*See* Dkt. No. 26.]   Specifically, the Court ruled that Plaintiffs had adequately alleged their contractual and quasi-contractual claims (Counts (i)-(iii)), but dismissed the various statutory consumer fraud claims and provided Plaintiffs leave to re-plead.   [*Id.*]   Also, by that Order, the Court compelled certain Plaintiffs' claims to arbitration.   [*Id.*]

Plaintiffs' First Amended Complaint, filed on September 17, 2020, asserted claims on behalf of a nationwide class for (Count i) breach of contract, (count ii) breach of the implied covenant of good faith and fair dealing, (Count iii) unjust enrichment, as well as statutory consumer fraud claims on behalf of: (i) a Wisconsin class under Wisconsin Statute § 100.18 (Count iv), an Illinois class under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.* (Count v), a Michigan class under the Michigan Consumer Protection Act, § 445.901, *et seq.* (Count vi), and a North Dakota class under its Unfair Trade Practices Law (Count vii).   [*See generally* Dkt. No. 27, ¶¶ 193-247.]

On October 1, 2020, Menards filed its Answer to the Amended Complaint as to the breach of contract, breach of implied covenant of good faith and fair dealing and the unjust enrichment claims as wells as affirmative and other defenses.   [*See* Dkt. No. 28.]   Menards then filed a motion to dismiss the consumer fraud claims asserted in Plaintiffs' Amended Complaint, arguing that

those claims should be dismissed because: (i) Plaintiffs allegedly failed to plead that Menards' rebate program had caused them harm, in spite of the fact that Plaintiffs alleged they saw an advertisement for an 11% Off Everything rebate program and did not receive an accurate rebate; (ii) Plaintiffs' consumer fraud allegations were implausible; and (iii) Plaintiffs included "hearsay" statements from other consumers available via public websites complaining of Menards' administration of its 11% Off Everything rebate program. [*See* Dkt. No. 29.]

On December 11, 2020, this Court denied Menards' motion to dismiss in its entirety. [Dkt. No. 48.] The Court held that (i) it was reasonable to infer that Menards' advertisement of the 11% Off Everything rebate program materially induced or proximately caused Plaintiffs' alleged harm; (ii) it was not implausible that a retailer would offer a rebate program but administer it in such a way to drive down redemption; and (iii) Plaintiffs' reliance on publicly-available statements criticizing the administration of Menards' 11% Off Everything rebate program were not a basis to dismiss the pleading. [*Id.*] Following the denial of its partial motion to dismiss, Menards filed its Answer to the Amended Complaint on December 28, 2020. [Dkt. No. 49.]

**B.    Plaintiffs Produced All Records In Their Possession, Custody, or Control During Discovery and Spent Months Attempting to Obtain Relevant Records from Menards.**

Plaintiffs, on September 21, 2020, served their First Set of Interrogatories and their First Set of Requests for Production of Documents that included, among other things, requests for documents that show how many customers submitted rebates but did not actually receive their sought rebates. [*See* Declaration of Sabita Soneji ("Soneji Decl."), ¶ 3 & Ex. B at RFP Nos. 15-16, 20 & 24.] Plaintiffs' additionally sought (i) records sufficient to show which Menards customers submitted rebate paperwork in connection with the 11% Off Everything rebate program; (ii) the number of customers who actually received a rebate check, and in what amount; (iii) documents sufficient to show which Menards customers redeemed these rebate checks; (iv)

documents sufficient to show how Menards determined the amount of the rebate check to issue; and (v) documents sufficient to show the type of information Menards maintained in its databases pertaining to these transactions. [*Id.* at RFP Nos. 15-21.] Plaintiffs also sought the total number of receipts and claim forms submitted to Menards, and the amount that the customers paid for the goods that were the subject of the submitted rebate. [*Id.* at RFP No. 15-16.]

In November 2020, Menards refused to provide documents regarding its nonpayment or underpayment of rebates, and instead produced only documents showing the rebates that were submitted and entered into Menards' system as well as the check amount issued. [*Id.*, ¶ 4.] As Plaintiffs explained in multiple calls with Menards' counsel, those records neither showed the relevant underlying transaction history (*i.e.*, what was purchased and in what amount), nor indicated if there was an "error" in processing the rebate that might lead to the rebate being rejected or adjusted. [*Id.*, ¶ 5.] Menards would not tell Plaintiffs how many customers submitted rebate paperwork but did not receive a corresponding rebate check, claiming without any evidence that such people did not exist. [*Id.*, ¶ 5.][6]

Plaintiffs also responded to Menards' discovery requests by producing all available documentation they had in connection with this lawsuit and answering written discovery. [Almeida Decl., ¶ 7.] As Menards well knows, Plaintiffs were required to send original receipts and rebate forms to Menards in connection with the 11% Off Everything rebate submissions, so Plaintiffs' records were unsurprisingly limited. [*Id.*] Plaintiffs were able to detail what information they had concerning their purchases to Menards in their pleadings, and Menards

---

[6]    Although counsel for Menards also agreed to produce customer complaints in response to RFP No. 13, it ultimately did not produce any complaints to Plaintiffs beyond those from the Better Business Bureau. [*See* Soneji Decl., ¶ 6.]

appeared more than capable of using this information to pull the underlying transaction data, as discussed *infra*, Section I.C.1.

Counsel for Plaintiffs met and conferred on multiple occasions with counsel for Menards regarding Menards incomplete document production. [Soneji Decl., ¶ 7.] On November 30, 2020, counsel for Plaintiffs asked Menards' counsel "When do you expect Menards production to be complete?" [*Id*.] The parties met and conferred regarding Menards' initial discovery responses on December 2, 2020. [*Id*., ¶ 8.] In an effort to narrow and specify their requests, Plaintiffs then served their Second Set of Requests for the Production of Documents on Menards on December 3, 2020. [*Id*., ¶ 9.] The parties then met and conferred regarding this set of requests on February 5, 2021. [*Id*., ¶ 10.]

In late December 2020 and early January of this year, Plaintiffs took the deposition of Michael Every, Michelle Rehder and Matthew Bittner, each of which Menards designated as Rule 30(b)(6) corporate witnesses. [Soneji Decl., ¶ 11.]

On January 19, 2021, Plaintiffs moved to certify a nationwide class and several subclasses of consumers impacted by Menards' failure to issue (either in full or at all) the rebates promised by its 11% Off Everything rebate program. [*See* Dkt. No. 50-51.] Plaintiffs retained an expert, Dr. Mickey Ferri, to provide a model for calculating damages on a class-wide basis despite Menards' failure to produce the transactional data underlying its rebate awards and rejections. [*See* Dkt. No. 65.]

Despite Plaintiffs' efforts, Menards never produced the requested transactional information. Accordingly, on March 1, 2021, Plaintiffs moved to compel this data. [*See* Dkt. No. 81-82.] Ironically, Menards consistently denied Plaintiffs' counsel access to relevant transactional data on the basis that there could be no plausible allegation that Menards' rebate system failed to

calculate the 11% Off Everything rebate amount correctly at the time of processing, while simultaneously denying Plaintiffs' access to records that would actually show whether this bald assertion was true. [*See, e.g.*, Dkt. No. 82 at 13.]

**C.    Menards' and Its Counsel's Conduct During the Course of the Litigation.**

*1.    Menards' "Rule 11" Letter Undercuts its Belated Attempt at § 1927 Sanctions*

The day before Plaintiffs filed their Amended Complaint, counsel for Menards served a letter on counsel for Plaintiffs. [*See* Dkt. No. 98 at Ex. 4.] Menards contended that Plaintiffs knew, or should have known, that they had no good faith basis to assert their claims for two reasons.[7] First, Menards cited a declaration it filed in another lawsuit pending in the Eastern District of Wisconsin. According to Menards, that declaration "confirms that on average Menards issues merchandise credit checks for its 11% rebate sales in an amount equal to 70% of the total dollars eligible for rebates, which is greatly in excess of average rebate redemption rates. In addition, on a total dollar basis, customers have so far used, on average, 91% of the merchandise credit checks Menards has issued to make additional purchases." [*Id*. at 3.] Second, Menards alleged that "as Plaintiffs are well aware, they have routinely participated in Menards 11% rebate sales for years, applying for, receiving and redeeming dozens of merchandise credit checks." [*Id*.]

---

[7]    Although this letter was under the guise of Rule 11, the letter made no mention of Rule 11 nor attempted at all to comply with Rule 11's safe harbor provision. That is, Menards was required to serve an actual Rule 11 motion on Plaintiffs laying out the basis for the claimed sanctions or at least a letter with sufficient evidence to constitute substantial compliance. Menards did neither. *See, e.g.*, *N. Illinois Telecom, Inc. v. PNC Bank, N.A.*, 850 F.3d 880, 888–89 (7th Cir. 2017) ("PNC Bank was entitled, if it chose, to huff and puff about Rule 11 in its settlement demands for dismissal of baseless claims. But its posturing did not amount even to substantial compliance with the warning-shot/safe-harbor provision, let alone to the actual compliance that other circuits demand.").

Menards' letter provided no evidence or documentation supporting either statement. However, the letter reveals that, as of the date of that letter (September 16, 2020), Menards had retrieved each of Plaintiffs' purchase and rebate histories sufficiently to assert that these Plaintiffs "routinely participated in Menards 11% rebate sales" and "reciev[ed] and redeem[ed] dozens of merchandise credit checks." [*Id.*] Menards did not provide Plaintiffs' counsel with any of those purchase and rebate histories at the time.

 2. *Menards Engages in Discovery Gamesmanship*

During discovery, Menards' counsel engaged in tactics that sought to intimidate Plaintiffs and their counsel rather than quickly get to the truth. As one example, Menards served a very broad subpoena on the business of Plaintiff Chris Jesse, seeking invasive and irrelevant information, such as the business's tax records; copies of building permits; operating agreements; the identity of any individual that provided accounting, financial or tax advice to the business; and all filings the business made with the Wisconsin Department of Financial Institutions. [*See* Soneji Decl., ¶ 12.] Menards also repeatedly claimed in correspondence that Plaintiffs had failed to comply with their discovery obligations. [Soneji Decl., ¶ 13.] But Menards never explained what Plaintiffs had allegedly failed to provide or produce, and Menards never identified during the many discovery conferences with Plaintiffs these often-cited alleged "deficiencies." [*Id.*] Menards' counsel further repeatedly sought to inspect "original" records belonging to Plaintiffs. Plaintiffs willingly offered to let Menards inspect any client-original documents, but Menards turned this endeavor into a confounding game of "gotcha" where Menards disputed what it meant to be an "original" document. [*See* Dkt. No. 98 at Ex. 24.] Menards instead wasted counsel's time and never showed up to the scheduled in-person inspection on which they insisted. [*Id.*]

*Only after Plaintiffs moved for class certification*, Menards, on February 9, 2021, produced several thousand additional pages' worth of documents pertaining to Plaintiffs' purchases and rebates. [Soneji Decl., ¶ 14.]   Although Menards insisted Plaintiffs destroy records relevant to responding to this Motion (*see infra*, Section I.D), based on the Bates ranges of the documents attached to Menards' Motion, many of the documents that Menards relies on to claim that Plaintiffs should have known their case had no merit were *not produced until this February 2021 production.* [*See, e.g.*, Doc. No. 92 at Exs. 17, 30, 34, 38-39, 40-41 & 44-46; Soneji Decl., ¶ 14.]   Importantly, this production included records labeled "bar code histories" which appear to show the redemption history of Plaintiffs' rebates. [*See* Dkt. No. 98 at Exs. 30, 41 & 45.]   All of these documents are labeled as "Confidential Information."   [*Id.*]

Less than two weeks after this production,  Chris Jesse, Barry Earls and Thomas Fetsch sat for depositions beginning on February 23, February 24 and March 2, 2021, respectively.   [Soneji Decl., ¶ 15.]   During these depositions,  Menards' counsel walked the deponents  through its production and only then revealed that, based on the purchases, returns, adjustments and other transaction data, that they received rebates in the appropriate amounts.  [*Id.*]

3.    *Menards' Counsel Attempted to Change Its 30(b)(6) Corporate Representative's Sworn Testimony Via an Errata Sheet*

Plaintiffs took the deposition  of Menards' 30(b)(6) witness Matt Bittner on January 6, 2021.  [See Dkt. 78 at Ex. 2.]   During that deposition, Plaintiffs secured clear testimony about Menards ability to search for and produce transaction records relevant to class certification.  That testimony was contrary to what Menards' counsel had repeatedly told Plaintiffs' counsel, namely that Menards could not search for or produce the records Plaintiffs requested. Shortly after the deposition,  however, Menards submitted an errata sheet for Mr. Bittner which materially altered his deposition testimony and to claim that the transactional records Plaintiffs sought in connection

with their case did not exist or could not be produced. [*See* Dkt. No. 76 at 6-7; 10-11.][8]  By way of example, Mr. Bittner sought to change his answer that a user of Menards' system could retrieve information from a clear "yes" answer to an "I do not understand the question." [Dkt. No. 76 at p. 5.]  But Mr. Bittner answered these questions affirmatively and never indicated he did not understand them. Menards' rewrite of deposition testimony was highly prejudicial to Plaintiffs and plainly unethical.  Mr. Bittner also added in testimony that he never offered during his deposition, to disclaim Menards' ability to retrieve records that Plaintiffs sought to compel Menards to produced.  Specifically, Mr. Bittner sought to provide testimony that Menards "cannot search for a customer who did not receive a rebate" and that Menards is limited in its ability to export records from its own database. [*Id*. at p. 7 & 10.]  Yet he made no such statements on the record during his deposition and, in fact, testified to the opposite, thus depriving Plaintiffs of an opportunity to ask follow-up questions regarding these representations.

As a result of this wholly inappropriate effort to undermine sworn testimony of a corporate representative, Plaintiffs' counsel was forced to file a motion to strike the errata sheet. [Dkt. No. 76.]

### 4. *Menards Flip-Flops on Plaintiffs' Unopposed Motion to Voluntarily Dismiss*

After the depositions of Chris Jesse, Barry Earls and Thomas Fetsch, counsel for Plaintiffs, in consultation with their clients, made the difficult decision to voluntarily dismiss their claims against Menards.  Plaintiffs' counsel sent a draft of its dismissal motion to Menards' counsel prior to filing. [Almeida Decl., ¶ 14.]  Counsel for Menards agreed that it would not oppose Plaintiffs'

---

[8]  The motion to strike was withdrawn when Plaintiffs sought this Court's approval to voluntarily dismiss the case.

Motion for Voluntary Dismissal [*id.*, ¶ 14], which specifically sought for parties to bear their own fees and costs. [Dkt. No. 92.]

After Plaintiffs filed the Unopposed Motion for Voluntary Dismissal, Menards then filed a response indicating that it supported dismissal of those Plaintiffs' claims, but disagreed with the characterization of the motion as unopposed, despite its earlier statement to Plaintiffs that it did not oppose the dismissal. Menards took this incongruous position regarding the dismissal, disputing again without evidence that there was any merit to Plaintiffs' lawsuit and claiming that it was "defamatory" of Plaintiffs to allege that there was any problem with respect to the administration of Menards' rebate program. [*See* Dkt. No. 93-94.] Before Plaintiffs could reply to Menards' mischaracterization of what had transpired during the course of the litigation, this Court granted Plaintiffs' Motion for Voluntary Dismissal and closed the case. [Dkt. No. 95.] The order did not address whether the parties were to bear their own fees and costs, as the unopposed motion had requested. [*See* Dkt. No. 92; Dkt. No. 95.]

5.    *Prior to Its Filing, Menards Demands Plaintiffs Delete Records Necessary to Respond to the Sanctions Motion*

On March 8, 2021, counsel for Menards demanded that counsel destroy any documents designated as "Confidential Information" that had been produced by Menards and to provide declarations attesting to the fact that the documents were no longer in Plaintiffs' possession. [Almeida Decl., ¶ 16; Soneji Decl., ¶ 18.] Undersigned counsel promptly complied with this request to delete information and informed Menards' counsel of this compliance. [Almeida Decl, ¶¶ 17-18; Soneji Decl, ¶ 18.] All of the records produced by Menards pertaining to the issuance of rebate checks, Plaintiffs' purchase histories or any rebate records that were designated as "Confidential Information" by Menards were consequently destroyed. [Almeida Decl., ¶ 19; Soneji Decl., ¶ 19.]

The bad faith of that request was laid bare by Menards' subsequent Motion. Menards created a situation where Plaintiffs cannot fully respond to the allegations Menards makes concerning the history of production in this case in support of its request for sanctions. It is even more curious because Menards insisted Plaintiffs destroy its "confidential" documents, but now appears to think that this information is not confidential, as it attached these documents to its Motion without redacting or filing under seal. [*See, e.g.,* Dkt. No. 92 at Exs. 17, 30, 34, 38-39, 40-41 & 44-46.] In any event, based upon the Bates ranges attached to Menards' Motion, many of the records cited as a basis for why Plaintiffs should have known they had no claim were ***not produced until February 2021***, not November 2020, as Menards alleges. [*Id.*; Soneji Decl., ¶ 14.]

6.     *Menards Makes a Habit of Seeking Sanctions as a Punitive Measure Against Plaintiffs*

This is not the first time that Menards has claimed a party acted vexatiously in connection with litigation. Based upon a non-exhaustive search of available records, Menards has filed no less than eight (8) motions for sanctions over the past decade, seeking to recover a wide range of sanctions. [Almeida Decl., ¶ 20.] While a litigant is within its rights to file such requests in the appropriate situations, such frequent filings are consistent with Menards' aggressive approach to litigation in this case and further reason why sanctions are completely inappropriate here.

**D.     Plaintiffs' Counsel Did Not Engage in "Lawyer-Driven" Litigation.**

Contrary to Menards' assertion, Plaintiffs did not engage in "lawyer-driven" litigation. Instead, Plaintiffs' counsel conducted an extensive, multi-year investigation, prepared two comprehensive complaints, opposed two motions to dismiss and a motion to compel arbitration, engaged in fulsome discovery (including numerous meet-and-confer efforts), sought (for months) to obtain relevant data from Menards and prepared and filed a thorough motion for class certification. [*See* Almeida Decl., ¶ 9.] Moreover, Plaintiffs did their part as well, searching their

files, providing all available documentation, reviewing various filings, responding to written discovery and/or sitting for depositions. [Almeida Decl., ¶ 10.]

Menards' contention that this case was lawyer-driven is belied by the fact that Plaintiffs did *not* make a single settlement demand or overture during the entire pendency of the case. [Almeida Decl., ¶ 11.] Instead, as detailed below, Plaintiffs and their counsel diligently sought to gain a better understanding of Menards' rebate practices—despite being stonewalled at every turn, as well as gain insight into their own transactions at issue.

Named Plaintiffs only made a decision to voluntarily dismiss their claims when it became clear that there was no path forward with respect to their individual claims. Several of these Plaintiffs purchased items during an 11% Off Everything rebate sale but later returned some of them, which explained why their anticipated rebate checks which arrived some months later and did not match the anticipated rebate amount (the checks bear no detail or indication of which purchase(s) they pertain to). Other Plaintiffs received checks many months after they initially submitted rebate paperwork, and due to the fact that the check contained multiple rebates (without any explanation or detail), they did not connect the rebate check to the multiple long-overdue rebates at issue. Other Plaintiffs thought they had purchased items during an 11% Off Everything rebate sale, but were confused that the 11% Off Everything price adjustment sale terms were different than that of the rebate program. Simply put, the lengths through which Plaintiffs had to go to verify whether they received a rebate check underscores the need for increased visibility into Menards' rebate process.

And although these Plaintiffs dropped their claims against Menards with prejudice, the claims of the rest of the class are still live. Menards has not been vindicated just because a small

handful of participants in its 11% Off Everything rebate program dismissed their claims voluntarily.

Counsel for Plaintiffs are very experienced attorneys, with decades of experience litigating consumer class action lawsuits, both on the plaintiff and defense side. [Soneji Decl., ¶ 2; Declaration of David S. Almeida ("Almeida Decl."), ¶ 1.] They have never been sanctioned in connection with any action. [Almeida Decl., ¶ 2; Soneji Decl, ¶ 2.] Counsel expended tremendous time, effort and resources to litigate this case and to protect the interests of both Plaintiffs and absent class members. [Almeida Decl, ¶ 3; Soneji Decl, ¶¶ 3-11 & 15.]

## LEGAL STANDARD

The standard for the imposition of sanctions under Section 1927 is incredibly high and rightly so as the threat of such sanctions should not be resorted to lightly. Sanctions may be imposed against "attorney[s] or other person[s]... who so multipl[y] the proceedings in any case unreasonably and vexatiously[.]" *See* 28 U.S.C. § 1927. Section 1927 sanctions are intended to apply only to those lawyers who "needlessly delay ongoing litigation." *Overnite Transportation Co. v. Chicago Indus. Tire Co.*, 697 F.2d 789, 794 (7th Cir.1983). Moreover, Section 1927 sanctions are appropriate only in instances of "serious and studied disregard for the orderly process of justice." *Ross v. City of Waukegan*, 5 F.3d 1084, 1089 n. 6 (7th Cir. 1993) (quoting *Kiefel v. Las Vegas Hacienda, Inc.*, 404 F.2d 1163, 1167 (7th Cir.1968)). The Seventh Circuit has interpreted the term "vexatious" to mean subjective or objective bad faith. *See, e.g., Kotsilieris*, 966 F.2d at 1184 (citing *Ordower v. Feldman*, 826 F.2d 1569, 1574 (7th Cir. 1987) (noting that "intentional ill will or reckless conduct constitutes vexatious conduct")). "[T]he power to assess costs on the attorney involved 'is a power which the courts should exercise only in instances of a serious and studied disregard for the orderly process of justice.'" *Overnite Transp. Co.*, 697 F.2d at 795 (quoting *Kiefel*, 404 F.2d at 1167).

20

## ARGUMENT

Menards chose not to come forward at any point during which the case was pending with any evidence in its possession that demonstrated that the rebates over which the named Plaintiffs filed the instant litigation were issued and ultimately redeemed or not owed, even though counsel contends to have pulled records relevant to the transactions by at least September 2020. [*See* Dkt. No. 98, Ex. 4.] It is understandable why these particular consumers were mistaken—the administration of Menards' rebate program is inherently confusing and is the very reason why Plaintiffs filed this case to demand more transparency in connection with Menards' often-advertised 11% Off Everything rebate program. [*See* Dkt. No. 51 at pp. 38-42.] When Plaintiffs retained counsel, they had no way of knowing they might be precluded from recovering the amounts sought in their pleadings or why and in good faith believed they had complied with Menards' terms and conditions to obtain a rebate. Menard's counsel's tactics to withhold this information and instead dump large amounts of information in a piecemeal fashion, without explanation, buried amongst thousands of pages of irrelevant transactional data, resulted in the unnecessary expenditure of time and costs by Plaintiffs and their counsel, *not the other way around*. Despite all of this, Menards brazenly contends that this Court should impose sanctions for essentially three reasons. First, Menards alleges that counsel should not have filed suit on behalf of certain dismissed plaintiffs because these individuals' purchases were subject to arbitration clauses. Second, Menards alleges that Plaintiffs made "false" statements in their pleadings. Third, Menards claims that it was unfairly forced to expend time and resources to litigate a meritless case. As set forth herein, there is no factual, legal, or equitable basis for the relief sought by Menards.

A.    **THE FACT THAT THIS COURT FOUND THAT CERTAIN PLAINTIFFS WERE REQUIRED TO ARBITRATE THEIR CLAIMS PROVIDES NO BASIS FOR THE IMPOSITION OF SANCTIONS.**

Menards contends that Plaintiffs' counsel should be sanctioned from the onset of this case because several of the initial Plaintiffs were subject to arbitration clauses. This request should be denied. Plaintiffs had a good-faith basis to believe the arbitration clause at issue is unenforceable. And, as a policy matter, the premise of Menards' position is that a plaintiff should never be able to challenge the enforceability of any arbitration clause. The imposition of sanctions because some plaintiffs in a lawsuit were compelled to arbitration would be wholly inappropriate and chill future plaintiffs' efforts to vindicate their consumer rights.

1.    *Plaintiffs had a Good-Faith Basis to Challenge the Enforceability of Menards 2018 Arbitration Clause.*

Plaintiffs had a good-faith basis to pursue their claims against Menards through litigation and to believe they should not be bound to a post-purchase arbitration clause.[9] [*See* Dkt. No. 19.] Although the Court ultimately disagreed with that position, neither Plaintiffs nor their counsel acted in bad faith or failed to conduct a pre-filing investigation by naming those potentially subject to arbitration agreements as parties in the litigation.  *See, e.g., A.M. Castle & Co. v. United Steelworkers of Am.*, 898 F. Supp. 602, 615 (N.D. Ill. 1995) (enforcing arbitration clause but denying sanctions under Rule 11 where "[i]n light of the very difficult legal question presented by

---

[9]      Moreover, Menards could at any time have chosen to waive its newly-imposed arbitration clause to reduce the briefing and argument necessary. Courts routinely recognize that "[l]ike any other contractual right, the right to arbitrate can be waived." *See, e.g., A.D. v. Credit One Bank, N.A.*, 885 F.3d 1054, 1065 n.17 (7th Cir. 2018) (*citing St. Mary's Med. Ctr. of Evansville, Inc. v. Disco Aluminum Prod. Co.*, 969 F.2d 585, 590 (7th Cir. 1992) (upholding denial of motion to compel arbitration on the basis that the moving party waived its right through its actions); *Brickstructures, Inc. v. Coaster Dynamix, Inc.*, 952 F.3d 887, 892 (7th Cir. 2020) (holding that parties may waive arbitration clauses where they indicate they are willing to proceed in a district court in spite of an applicable arbitration clause).

this case, we can find no basis for describing Castle's position as frivolous or asserted in bad faith, nor can we find any evidence that the company intended to harass [defendant].").

Menards never approached Plaintiffs concerning the arbitration clause at issue under Rule 11, prior to moving to compel arbitration, as required under the Federal Rules. *See, e.g.*, *Local Union 802, Int'l Union of Painters & Allied Trades v. Surf-Prep, Inc.*, 18-CV-590-JDP, 2019 WL 168826, at *3 (W.D. Wis. Jan. 11, 2019), *appeal dismissed sub nom. Local 802, Int'l Union of Painters & Allied Trades v. Surf Prep, Inc.*, 19-1211, 2019 WL 3577630 (7th Cir. Aug. 2, 2019) (denying motion for sanctions in connection with a motion to compel arbitration where moving party failed to comply with Rule 11). Menards did not even request its fees at the time it moved to dismiss and compel arbitration. *See, e.g.*, *ARcare*, Case No. 3:17-cv-00313-wmc, D.I. # 23, at *4 (W.D. Wisc. Nov. 22, 2017) (noting that defendant never sought Rule 11 sanctions through proper channels; "Here, however, defendant's failure to make further efforts to streamline this litigation, and save time and effort on the part of both the litigants and the court, does not justify taxing fees and cots or other sanctions on balance."). Now, however, Menards is using that motion to compel arbitration as a basis to seek fees for the entirety of the litigation even though Menards' arbitration clause did *not* dismiss all Plaintiffs from this action. [*See* Doc. No. 26 at 16 (dismissing the claims of seven individuals subject to arbitration clauses, but allowing the claims of the remaining six named Plaintiffs to move forward).]

> ## 2. Accepting Menards' Position, No Plaintiff Could Ever Challenge the Enforceability of an Arbitration Clause.

Unbelievably, Menards now uses the fact that it prevailed on a motion to compel arbitration as a basis to seek fees for the entirety of the litigation, despite the fact that the remaining Plaintiffs' claims were obviously not subject to the arbitration clause. Menards' request is a complete overreach. And if it is true that any party subject to an arbitration clause can be sanctioned *vis-à-*

*vis* Section 1927 (or any other sanctions mechanism, for that matter), then a plaintiff could never challenge the validity or enforceability of an arbitration clause without running the risk of sanctions, no matter how strong the plaintiff's position may be. It would be an even more nonsensical result here where some Plaintiffs were compelled to arbitration and the defendant used that result to seek recovery of fees associated with litigating the remainder of the case against parties not compelled to arbitration.

**B.   PLAINTIFFS AND THEIR COUNSEL CONDUCTED A THOROUGH PRE-SUIT INVESTIGATION AND BEHAVED WITH CANDOR AND PROFESSIONALISM THROUGHOUT THE LITIGATION.**

At its heart, this is a lawsuit about Menards' lack of transparency. Plaintiffs brought this case because they believed they were wrongfully denied the full amount of their rebates and that Menards prevented consumers from receiving and redeeming their entitled-to rebates. In addition to a Rule 23(b)(3) damages class, Plaintiffs sought to certify a Rule 23(b)(2) injunctive relief class because they contended—and continue to believe—that changes to Menards' rebate system are warranted to achieve greater transparency, increased visibility and ultimately increased receipt and redemption of earned rebates. Menards claims—without basis—that counsel for Plaintiffs failed to act with the requisite diligence to file this suit, a claim that is directly refuted by the facts in this case (both pre-suit and during litigation) detailed herein.

Plaintiffs provided counsel with the details regarding the items they purchased from Menards during its 11% Off Everything rebate program, the dates of purchase, any documentation related to the transactions or the rebates if available, the store from which these items were purchased, the anticipated amount of rebate, whatever efforts Plaintiffs made to communicate with Menards in connection with these rebates, and any amount of rebate received. [*See* Dkt. No. 1, ¶¶ 60-67; 68-73; 84-85; 86-95; 96-105; 106-112; 113-120; 121-129; 130-140; 141-149; 150-157;

158-167 & 168-173.]   Moreover, counsel for Plaintiffs received hundreds of complaints from Menards customers concerning the 11% Off Everything rebate program and interviewed dozens of would-be plaintiffs.   Only six individual Plaintiffs dismissed their claims against Menards with prejudice.   [Dkt. No. 92.]

Menards' administration of its 11% Off Everything rebate program makes it plain to see why Plaintiffs experienced the concerns and frustrations they did.   Menards requires customers to provide original receipts and rebate forms, thereby depriving them of the ability to consult or review that documentation to verify they received the correct amount upon receipt of a rebate check.   Menards does not inform consumers if a rebate is denied, in whole or in part, let alone the basis for any such denials.   If and when Menards sends rebate checks, it does not provide the customer with any corresponding transaction detail in order for recipients to cross-check with their records.   As with the thousands of consumers complaining online, these Plaintiffs wanted clear information about their rebates and they willingly served as class representatives to attempt to get them.   Plaintiffs should never be sanctioned for litigating what they reasonably and appropriately considered to be valid claims.

Menards had the ability to share the evidence it—and only it—had regarding these Plaintiffs' transactions.   Menards' letter dated September 16, 2020, demonstrated that Menards had already pulled Plaintiffs' transaction histories and reviewed them, since Menards alleged in the letter that it had reviewed Plaintiffs' rebate submission and redemption information.   [Dkt. No. 98 at Ex. 4.]   If Menards had shared its accounting of Plaintiffs' rebates with Plaintiffs earlier, they could have re-evaluated their claims at the early stages of the litigation.   Instead, Menards drew out this litigation for months and created the crisis, of which it now complains (and seeks its fees throughout the entirety of the litigation).   Rather than fix the problems with its rebate program,

Menards paints itself as the victim. The Better Business Bureau complaints and investigation are wrong. The prolific number of publicly available complaints on the internet is wrong. Plaintiffs are wrong. Plaintiffs' lawyers are wrong. Plaintiffs in other lawsuits challenging the administration of Menards' 11% Off Everything rebate program are wrong. Everyone is wrong but Menards.

This Court has denied sanctions even in the most extreme cases of a plaintiff's pursuit of a case, none of which are present here. In *Stockbridge-Munsee Community v. Wisconsin*, for example, this Court denied sanctions against counsel under Section 1927 for changing litigation positions, pleading claims which allegedly lacked evidentiary support, and re-pleading dismissed claims. 17-CV-249-JDP, 2018 WL 708389, at *4–5 (W.D. Wis. Feb. 2, 2018), *aff'd*, 922 F.3d 818 (7th Cir. 2019). This Court noted that even "[s]imple negligence" by the attorney does not warrant a sanction under § 1927. *Id*. (citing *Boyer v. BNSF Ry. Co.*, 824 F.3d 694, 708 (7th Cir.), *cert. denied*, 137 S. Ct. 391 (2016)). And attempts to sustain the action, despite the actions being time-barred, "did not so significantly prolong or complicate the litigation." *Id*. at 5. The Court denied the request for sanctions and noted that "this is a matter of great importance to the *Stockbridge-Munsee*, so counsel's last-ditch effort to save the case is understandable, even if it was of questionable merit." *Id*. To be clear, none of the questionable litigation issues this Court evaluated in *Stockbridge-Munsee Community* were present here. Unlike in *Stockbridge*, Plaintiffs here had a substantial belief in their claims, both based on their own experiences with Menards' rebate program, as well as the hundreds of consumer complaints online, the Better Business Bureau investigation and other litigation pending against Menards for similar practices.

Similarly, in *Timothy B. O'Brien LLC v. Knott*, the plaintiff asserted what defendants regarded as frivolous copyright claims, and after plaintiff lost a motion for preliminary injunction,

26

plaintiff dismissed his claims. *See* 18-CV-684-JDP, 2019 WL 4722483, at *3 (W.D. Wis. May 16, 2019), *aff'd*, 962 F.3d 348 (7th Cir. 2020). Defendants argued that plaintiff should be sanctioned pursuant to Section 1927, but this Court held that these sanctions "are to be imposed sparingly, as they can 'have significant impact beyond the merits of the individual case.'" *Id.* (citing & quoting *Hartmarx Corp. v. Abboud*, 326 F.3d 862, 867 (7th Cir. 2003); *Pacific Dunlop Holdings, Inc. v. Barosh*, 22 F.3d 113, 118 (7th Cir. 1994)). This Court reasoned that since plaintiff abandoned his copyright claims voluntarily, "the claims did not vexatiously multiply the proceedings." *O'Brien*, 2019 WL 4722483, at 3. Here, not only did Plaintiffs' abandoned their claims voluntarily, they did so as soon as they recognized the challenges to their standing to bring them.

Other courts have routinely denied sanctions where a defendant argued that a plaintiff acted unreasonably or vexatiously when it engaged in disputes over records or evidence. *See, e.g., Northmobiletech, LLC v. Simon Prop. Group, Inc.*, 11-CV-287-WMC, 2013 WL 12090092, at *10 (W.D. Wis. May 21, 2013) ("Right at the outset, the court holds that it will not grant sanctions for discovery abuses. These matters are highly fact-intensive, and it is exponentially easier to award sanctions during discovery rather than months after the fact on a cold record…); *Delaware Motel Assoc., Inc. v. Capital Crossing Serv. Co. LLC*, 17 C 1715, 2019 WL 1932586, at *3 (N.D. Ill. May 1, 2019) (denying sanctions motion and rejecting "unsubstantiated speculation" that the basis for the lawsuit was an improper attempt to obtain discovery to which plaintiffs were not entitled); *Espenscheid v. DirectSat USA, LLC*, 09-CV-625-BBC, 2012 WL 12995333, at *6 (W.D. Wis. Feb. 27, 2012) (denying motion for sanctions under Section 1927 where plaintiffs provided an expert report that failed to comply with Fed. R. Civ. P. 26 and were accused of "failing to produce documents mandated by the federal rules, misrepresenting their role in creating Dr. Lewin's expert

report and attempting to deceive the court"); *HK Sys., Inc. v. Eaton Corp.*, 02-C-1103, 2009 WL 742676, at *6 (E.D. Wis. Mar. 18, 2009), *aff'd*, 353 Fed. Appx. 44 (7th Cir. 2009) ("Although Eaton does not directly accuse HK's counsel of advancing frivolous legal arguments, Eaton seems to contend that HK's legal theory was so weak that counsel deserves to be sanctioned for even presenting it to the court. Indeed, Eaton seems to argue that every action taken by HK's counsel to prosecute his theory of the case was vexatious. However, I find that HK's legal theory was reasonable."); *Blair v. Equifax Check Services, Inc.*, 97 C 8913, 1999 WL 116225, at *9 (N.D. Ill. Feb. 26, 1999), *aff'd*, 181 F.3d 832 (7th Cir. 1999) ("The Court does not find ECS' attorneys acted in subjective bad faith to multiply the proceedings, but it finds they merely made arguments regarding ethical violations based on scant evidence. While this conduct may constitute ordinary negligence, it certainly does not rise to the level of recklessness or indifference to the law."). Here, Plaintiffs proceeded with a well-founded and good-faith belief that Menards did not properly administer its 11% Off Everything rebate program. Discovery in this case was nuanced and fact-intensive, as shown by the myriad documents required to explain why these named Plaintiffs might not be entitled to rebates. [*See* Dkt. 97 at pp. 11-30; *see also* Soneji Decl., ¶¶ 14-17.]

As a final matter, if Menards truly believed Plaintiffs lacked a factual basis for their claims, it should not have waited months to bring the instant motion; "[t]he requirement that motions for sanctions be filed as soon as practicable after the discovery of a violation, as applied to a Rule 11 violation, has also been applied to sanctions pursuant to Section 1927." *XCO Int'l Inc. v. Pac. Sci. Co.*, 01 C 6851, 2003 WL 2006595, at *5 (N.D. Ill. Apr. 29, 2003), *aff'd on other grounds*, 369 F.3d 998 (7th Cir. 2004). Just because Menards ultimately produced—after much protest and delay—records showing that five Plaintiffs received their rebates does not mean that Plaintiffs' counsel failed to investigate their claims as fulsomely as they should have. More importantly, it

does not mean that the claims of the unnamed class members are any less valid or that Menards has been found not liable.

Moreover, once it became clear to these Plaintiffs that they lacked standing to assert their claims, undersigned counsel, with client approval, petitioned this Court to voluntary dismiss. There is no evidence to suggest that Plaintiffs' conduct is what unnecessarily multiplied this litigation, or that Plaintiffs hid pertinent information from Menards. Rather, the evidence suggests the opposite. Undersigned counsel thoroughly investigated and litigated a case representing numerous consumers who believed that Menards' rebate system was not transparent nor designed to ensure that all participating consumers received their full rebates. That underlying belief remains sound, even if these particular plaintiffs' claims were ultimately not viable. Menards has not come close to satisfying the exacting standards of 28 U.S.C. § 1927.

## C.   MENARDS' COUNSEL NEEDLESSLY AND PURPOSEFULLY MULTIPLIED THE LITIGATION.

Menards claims that it was forced to expend time and resources on briefing motions, conducting discovery and deposing Plaintiffs to oppose class certification. [*See* Dkt. No. 97 at 35.] Menards "had" to do all these things despite the fact that in September 2020 it claimed to have retrieved and reviewed the relevant evidence showing that Plaintiffs received their requested rebates. [Dkt. No. 98 at Ex. 4.] If Menards had this data in September 2020, why did it wait several months to produce it and force Plaintiffs' counsel to expend hundreds of hours litigating this case? Menards could have saved all parties great time and expense, and conserved judicial resources, had it been more forthcoming.

This Court has declined to impose sanctions on numerous occasions where the moving party bore similar responsibility for the conduct similar to that of Menards in this case. For instance, in *Stelzer v. Endeavor Bus. Media, LLC*, a serial-litigator plaintiff who had been

sanctioned on numerous occasions sought to back out of a settlement agreement. *See* 18-CV-979-JDP, 2020 WL 5105184, at *3 (W.D. Wis. Aug. 31, 2020). While the court cautioned plaintiff's conduct, it declined to impose sanctions because defendant's inexcusable delay in editing a settlement agreement was in part to blame, noting "[t]here is blame enough for both sides; it's fair that they bear their own expenses." *Id*.

In *Willert v. Andre*, this Court acknowledged in a contentious breach of contract dispute at the summary judgment stage that "Plaintiffs' evidentiary support for their claims is scant" but nonetheless did not impose sanctions under either Rule 11 or Section 1927. *See* 17-CV-496-JDP, 2018 WL 3637951, at *12 (W.D. Wis. July 30, 2018). The Court noted that when plaintiffs filed their claims, they did have reason to suspect that defendant had breached the underlying contract, and plaintiffs "presumably were hoping to uncover additional evidence in discovery, but failed to do so. Their claims were ultimately unsuccessful, but they were not entirely groundless." *Id*. The Court also noted that defendant failed to comply with Rule 11 in providing plaintiffs an opportunity to withdraw their claims. *Id*. The Court further denied sanctions under Section 1927 due to a parallel lawsuit which would have resolved the same issues, which defendant failed to properly bring to the court's attention, instead waiting more than one year to seek sanctions. *Id*. at *13.

Judge Conley's decision in *ARcare, Inc. v. American Lifeline, Inc*. is directly on point. In *Arcare*, the plaintiff alleged that the defendant violated the Telephone Consumer Protection Act by sending plaintiff unwanted fax messages. *ARcare*, Case No. 3:17-cv-00313-wmc, D.I. # 23, at *1 (W.D. Wisc. Nov. 22, 2017). Shortly after answering, defendant filed a motion for summary judgment indicating that plaintiff had explicitly consented to receive the allegedly unwanted fax messages. *Id*. Rather than respond, plaintiff dismissed the suit voluntarily pursuant to Rule 41(a)(1)(A). *Id*. at *2. Defendant then sought sanctions, claiming that plaintiff had clearly failed

to conduct a proper pre-filing investigation. *Id.* Judge Conley denied defendant's sanctions request, noting that that while defendant was well within its rights to aggressively litigate the case, it ran a risk with such tactics—rather than resolving this matter amicably, it chose to forge ahead with a motion for summary judgment in the hopes of recovering fees. *Id.* at *3-4 (observing that while plaintiff was certainly not "blameless" in the situation, "defendant's failure to make further efforts to streamline this litigation, and save time and effort on the part of both the litigants and the court, does not justify taxing fees and costs or other sanctions on balance").

For its part, Menards did nothing to clarify the rebate record of these Plaintiffs during the course of the litigation. Menards consistently withheld relevant information—including the records indicating that some Plaintiffs had in fact redeemed their rebate checks—*and did not produce this information until after Plaintiffs moved for class certification in February 2021.* [*See* Soneji Decl., ¶ 14.]

By way of example, Menards complains that Plaintiffs Barry Earls and Trent Shores did not purchase items during an 11% Off Everything rebate promotion. But Barry Earls and Trent Shores provided Menards with the dates of their alleged purchases. [Dkt. No. 1, ¶¶ 74 & 86.] If Menards' position was that Plaintiffs were not entitled to a rebate because their purchasers were not made during a rebate promotion window, it could have easily clarified this for Plaintiffs at the onset of the litigation. Instead, Menards posits that counsel for Plaintiffs should have examined the docket in a related action pending in the Eastern District of Wisconsin to have learned that no sale was running as of that date. [*See* Motion at 12.] Moreover, Plaintiff Barry Earls believed that he was entitled to price adjustments which were not properly honored. Barry Earls purchased items during an 11% Off Price Adjustment promotion—which is a sale that retroactively applies to products purchased before an 11% Off Everything Sale and has similar but not identical terms.

Menards claimed that the reason he did not receive the full 11% price adjustment was that he purchased an item on sale—a term specific to Menards' price adjustment but not applicable to the 11% Off Everything Sale. [Soneji Decl. at ¶ 16.] Not only did Mr. Earls believe there was no difference between an 11% price adjustment and the 11% Off Everything sale, but Menards' explanation for denying his rebate made little sense as Barry Earl's receipts showed no items purchased were on sale. [*Id*.] Even the Menards' store manager with whom Mr. Earls spoke after his rebate was denied was confused, telling him he did "everything right" and should have received his full rebate. [Dkt. No. 28 at ¶ 123.]

Menards similarly claims that Plaintiffs Chris Jesse, Steve Schussler, Tom Fetsch and Cassie Lietaert each received their full rebates, and Plaintiffs should have known this to be true. However, the relevant documentation to which Menards refers, showing that these Plaintiffs received and redeemed those rebates, was not provided to Plaintiffs' counsel until February 2021, just before Plaintiffs' depositions. [*See* Dkt. No. 98 at Exs. 30, 41 & 45.] Records pertaining to Tom Fetch's rebate history showing that he had redeemed certain rebates to which he claimed were not paid was similarly not produced until February 2021. [Soneji Decl., ¶ 17.] However, because Menards made Plaintiffs destroy all of the transaction data pertaining to Tom Fetsch, Plaintiffs are at a serious disadvantage to responding to Menards' allegations of wrongdoing based on Menards' own piecemeal production history. [Soneji Decl., ¶¶ 18-19.]

Given Menards' unilateral ability to access these transaction and rebate records, and its September 2020 letter to Plaintiffs indicating that it had reviewed these records, it is hard to comprehend why Menards only produced relevant information to Plaintiffs as late as February 2021. At a minimum, that history undermines Menards' claims that Plaintiffs acted vexatiously or in bad faith. As noted above, Section 1927 sanctions are appropriate only in instances of

"serious and studied disregard for the orderly process of justice." *Ross*, 5 F.3d at 1089 n. 6 (quoting *Kiefel.*, 404 F.2d at 1167). It cannot be said, based upon the foregoing, that counsel for Plaintiffs acted unreasonably and they should absolutely not bear the brunt of Menards' legal fees for bringing a case in good faith to vindicate their consumer rights.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request this Honorable Court to deny Menards' motion for sanctions pursuant to 28 U.S.C. § 1927 in its entirety, and to award all such other relief as is equitable and just.

Dated:    May 11, 2021                          Respectfully submitted,

                                                */s/ David S. Almeida*
                                                David S. Almeida
                                                Suzanne M. Alton de Eraso
                                                   *(admitted pro hac vice)*
                                                Matthew J. Langley
                                                   *(admitted pro hac vice)*
                                                **BENESCH, FRIEDLANDER, COPLAN
                                                & ARONOFF LLP**
                                                71 S. Wacker Dr., Suite 1600
                                                Chicago, IL 60622
                                                (312) 212-4979
                                                Fax: (312) 767-9192
                                                dalmeida@beneschlaw.com
                                                saltondeeraso@beneschlaw.com
                                                mlangley@beneschlaw.com

                                                Sabita J. Soneji (*admitted pro hac vice*)
                                                Mallory Morales (*admitted pro hac vice*)
                                                **TYCKO & ZAVAREEI LLP**
                                                1970 Broadway, Suite 1070
                                                Oakland, CA 94612
                                                (510) 254-6808
                                                Fax: (202) 973-0950
                                                ssoneji@tzlegal.com
                                                mmorales@tzlegal.com

Eric J. Haag
**ATTERBURY, KAMMER & HAAG, S.C.**
8500 Greenway Blvd., Suite 103
Middleton, WI 53562
(608) 821-4600
Fax: (608) 821-4610
ehaag@wiscinjurylawyers.com

*Attorneys for Plaintiffs*