**TYCKO & ZAVAREEI LLP**
Sabita J. Soneji (*admitted pro hac vice*)
1970 Broadway, Suite 1070
Oakland, CA 94612
(510) 254-6808
Fax: (202) 973-0950
ssoneji@tzlegal.com

David S. Almeida
**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**
71 S. Wacker Dr., Suite 1600
Chicago, IL 60606
(312) 212-4979
Fax: (312) 767-9192
dalmeida@beneschlaw.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| BARRY EARLS, THOMAS FETSCH, TRENT SHORES, STEVE SCHUSSLER, CASSIE LIETAERT and CHRIS JESSE, *individually and on behalf of a class of similarly situated individuals*,<br><br>Plaintiffs,<br><br>v.<br><br>MENARD, INC., a Wisconsin corporation,<br><br>Defendant. | Case No. 20-CV-107<br><br>**ORAL ARGUMENT REQUESTED**<br><br>Judge: Hon. James D. Peterson<br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO RECONSIDER THIS COURT'S ORDER GRANTING SANCTIONS PURSUANT TO 28 U.S.C. § 1927** |

Plaintiffs Barry Earls, Thomas Fetsch, Trent Shores, Steve Schussler, Cassie Lietaert and Chris Jessie (collectively, "Plaintiffs"), by and through undersigned counsel, respectfully submit this Motion to Reconsider this Court's March 31, 2022 Opinion and Order Granting Sanctions Pursuant to 28 U.S.C. § 1927 (the "Motion").

## INTRODUCTION AND RELEVANT BACKGROUND

Reconsideration of this Court's March 31, 2022 Opinion and Order Granting Sanctions Pursuant to 28 U.S.C. § 1927 (Dkt. 106, the "Order") is warranted because a number of the Order's operative factual findings are not supported by the record evidence. By way of this motion, Plaintiffs' counsel hope to clarify the evidence and seek an opportunity to address the Court either at argument or under oath regarding their conduct in this case.

Sanctions under 28 U.S.C. § 1927 are only appropriate where a party has engaged in bad faith, such as "reckless and indifferent conduct." *Kotsilieris v. Chalmers*, 966 F.2d 1181, 1185 (7th Cir. 1992). Plaintiffs' counsel conduct in this case was far from reckless.

First, Plaintiffs' counsel conducted a diligent pre-suit investigation, reasonably relying upon the good faith belief of dozens and dozens of Menards' customers, named plaintiffs and otherwise, who repeatedly stated that they had submitted rebates which Menards failed to pay in full or in part as well as documents that supported their claims. Plaintiffs' counsel interviewed the representative Plaintiffs numerous times—at the client intake stage, in connection with preparation of the original and amended complaints (both withstood motions to dismiss), in responding to Menards' written discovery requests and later in preparing the witnesses for deposition. Moreover, although Plaintiffs' documentation was necessarily limited as Menards required those seeking rebates to submit their original receipts, Plaintiffs' counsel reviewed everything they could access, including credit card and bank statements, and email correspondence with Menards, to substantiate Plaintiffs' claims.[1]   Plaintiffs filed their complaint only after multiple interviews of the

---

[1]   To the extent that Plaintiffs' counsel did not address any specific concerns the Court had (for instance, whether they reviewed Menards' November 2020 document productions), counsel apologizes to the Court for not addressing previously but those efforts were detailed extensively in Plaintiffs' Motion to Compel filed on March 1, 2021, which was subsequently withdrawn when Plaintiffs sought leave to voluntarily dismiss their claims.

representative Plaintiffs and receipt of confirmation that the information contained in the complaint was accurate to the best of their knowledge, information and belief.

Plaintiffs' counsel did not stop their investigation at the filing of the Complaint. They sought in discovery all transaction and rebate data for the plaintiffs and the class. On November 27, 2020, Menards produced 95 spreadsheets each containing around a million lines of data each, totaling 95 million lines of data ostensibly reflecting every customer transaction amount and rebate awarded and redeemed during the class period from 2014 to 2017 (MENARDS-EARLS_8799-8893).

Menards insisted to the Court that by November 27, 2020 they had provided Plaintiffs' counsel all the information about transactions, rebates and redemptions needed to conclusively evaluate Plaintiffs' claims. *See* Dkt. 104 at 23. And, the Order adopted this assertion. *See* Order at *8 (citing Dkt 104 at 23 and concluding that "Menards produced the records related to plaintiffs' allegations in November 2020"). That conclusion is contrary to the record evidence. In fact, Menards' November 27, 2020 production was inscrutable, with data fields and shorthand that were only comprehensible to Menards itself. The spreadsheets containing 95 million lines of data were produced as an excel file, leaving Plaintiffs' counsel to review the information manually.

Plaintiffs asked during meet and confer calls for assistance to understand that database information dump. In response, Menards' counsel only directed Plaintiffs' counsel to ask about this convoluted data production during their 30(b)(6) depositions, the first of which took place on December 31, 2020 (Ms. Rehder) and was followed up by a second on January 6, 2021 (Mr. Bittner). Ms. Rehder, Menards' first 30b6 witness, could not testify regarding the produced spreadsheets and it was not until the January 6, 2021 deposition of Matt Bittner,

information systems manager, that Menards was able to provide some information regarding the data fields in the spreadsheets but even then, Mr. Bittner was not able to answer Plaintiffs' counsel's questions regarding the meaning and import of some of the various coding and terminology.  *See* Dkt No. 68 (part 2), Bittner Dep. Tr. at 113:10-20.

In addition, the transaction details Menards produced in November 2020 did *not* contain all transaction and rebate detail for all named plaintiffs. Much of the documentation showing what these Plaintiffs purchased and when, as well as any rebates these Plaintiffs received and redeemed was *not* provided to Plaintiffs' counsel until February 8, 2021, just a couple weeks before Plaintiffs' depositions.  On that date, Menards produced 2,824 documents (bates range MENARDS-EARLS_0010794 to 0013618), that included detailed information for rebates Menards issued to Plaintiffs and detail for the underlying transactions.  Menards made that large, belated production despite Menards' counsel telling Plaintiffs that their production was substantially complete on November 30, 2020.[2]  That is, only after Plaintiffs moved for class certification on January 17, 2021,[3] did Menards—despite numerous prior requests from Plaintiffs' counsel—produce all of the relevant transactional detail regarding named Plaintiffs' actual

---

[2]     *See* November 30, 2020 email from Menards' counsel, attached as Ex. A to the Declaration of Sabita J. Soneji, dated April 21, 2022, filed in support of Plaintiffs' Motion to Reconsider ("Soneji 4/21/22 Decl."), stating that "Menards believes that it has produced substantially all of the documents that it agreed to produce, subject to its objections.  We are still investigating a few additional documents that may relate to purchases by plaintiffs and the existence of documents relating specifically to a decision – if any – to send rebates to customers in their current form.  But those should be resolved in the next few days."

[3]     To allow time to resolve the myriad ongoing discovery disputes and to analyze what Menards would produce, Plaintiffs, in November 2020, sought to modify the scheduling order by pushing back the data for filing their class certification motion. Menards opposed and the Court denied that request by minute entry. The Court's finding that Plaintiffs' counsel unnecessarily multiplied the proceedings by "filing a motion for class certification, and several discovery motions" is counter to this record of diligence and Plaintiffs' counsel's efforts to *avoid* unnecessary work for the parties.

purchases and rebates.  Plaintiffs' counsel did *not* possess all the information needed to determine whether Plaintiffs had viable claims in November of 2020.

Plaintiffs believe the best evidence showing that it was not simple or straightforward to match transactions with rebates for the named Plaintiffs and showing how inscrutable the November 27, 2020 database production was, would be Menards' productions themselves. Unfortunately, on March 8, 2021, just a few weeks before filing their motion seeking sanctions, Menards demanded Plaintiffs' counsel destroy all evidence produced in the case. That was extremely prejudicial to Plaintiffs' efforts to respond to Menards' allegations of wrongdoing, which would benefit from concrete examples showing the opacity in Menards' productions. *See* Dkt. 102, Soneji Decl., ¶¶ 18-19.

Tellingly, although Menards claimed in its motion that Plaintiffs had all the data needed in November 2020, they did not attach to their motion that voluminous spreadsheet with millions of lines of data. Instead, and though it failed to mention its February 2021 production in its Motion for Sanctions, ***Menards relied on and attached to its motion many documents that were not produced until February 8, 2021***.[4]

Menards also used those February 2021 documents in three Plaintiff depositions (together with a composite exhibit Menards introduced for the first time at those depositions made up of a few lines of transaction and rebate data cherrypicked from the 95 million lines of data produced in November 2020) to demonstrate that two of those named plaintiffs had submitted and received their proper rebates. One additional plaintiff, Barry Earls, made his underlying purchases the day

---

[4]   *See* Dkt. 98-17 (MENARDS-EARLS 0011024-11039), Dkt. 98-30 (MENARDS-EARLS_0011843), Dkt. 98-34 (MENARDS-EARLS_0010892), Dkt. 98-38 (MENARDS-EARLS_0013538-13544), Dkt. 98-39 (MENARDS-EARLS_0011430-11435), Dkt. 98-40 (MENARDS-EARLS_0013526-13530), Dkt. 98-41 (MENARDS-EARLS_0013327), Dkt. 98-44 (MENARDS-EARLS_0011424-11425), Dkt. 98-45 (MENARDS-EARLS_0011460).

before an 11% off everything promotion but was told by a Menards representative—and testified as much—that he was still eligible to receive the rebate; to this day he never received the rebate he was promised. Although Plaintiffs' counsel could have proceeded with Mr. Earls' case, they elected to dismiss all the claims of all plaintiffs shortly after Menards' finally produced the documents—and deciphered them during the depositions using demonstrative exhibits it did not produce to Plaintiffs—showing the other plaintiffs received their rebates.

In its Order, the Court expressed concern that if counsel had conducted an adequate inquiry of the representative Plaintiffs, then they would have discovered that the factual circumstances regarding those rebate submissions did not give rise to viable claims, particularly by November of 2020 when Plaintiffs responded to Menards' written discovery requests. *See, e.g.*, Order at *7 (stating that "the allegations made by the plaintiffs were straightforward, and all relied on facts within the plaintiffs' own knowledge"). As this factual background shows, the evidence in this case was scattered and opaque and Plaintiffs' counsel's reasonable reliance on Plaintiffs' consistent recollection, coupled with diligent efforts to compel and understand the underlying Menards data, do not support a finding that Plaintiffs' counsel was reckless or vexatiously multiplied the litigation.[5]

The mere fact that Menards was able to demonstrate that two named Plaintiffs' claims were not actionable—by walking certain Plaintiffs through their transaction information in a format in which it had not been produced—should not change that conclusion. And, whether or not two named Plaintiffs ultimately got it wrong, that is not the standard upon which sanctions should be

---

[5] Instead of providing the information that would have allowed Plaintiffs' counsel to understand the purchase records and rebate information it produced, Menards waited until Plaintiffs' depositions and walked them through a composite that focused on just a few lines of text from that approximately 95 million line spreadsheet—demonstrating that counsel for Menards' should have responded to Plaintiffs' counsel's efforts to understand those records by cooperating in simple discovery.

imposed. *See, e.g.*, *Dal Pozzo v. Basic Mach. Co*., 463 F.3d 609, 614 (7th Cir. 2006) (finding that there is no objective bad faith if the conduct had a colorable basis); *Kotsilieris,* 966 F.2d at 1185 (concluding that mere negligence is not enough to warrant sanctions, instead the standard is that the attorney must act with recklessness or indifference"). Plaintiffs' counsel respectfully requests the opportunity to address any remaining concerns in person at a hearing.

## LEGAL STANDARD

Federal Rule of Civil Procedure 54(b) permits the Court to reconsider interlocutory orders "at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." The court will grant a motion under Rule 54(b) "to correct manifest errors of law or fact or to present newly discovered evidence." *Woods v. Resnick*, 725 F.Supp.2d 809, 827-28 (W.D. Wis. 2010) (citing *Rothwell Cotton Co. v. Rosenthal & Co.*, 827 F.2d 246, 251 (7th Cir. 1987)). Rule 54(b) is the appropriate vehicle for seeking reconsideration of an attorney's fee order prior to an award of a defined amount. *See, e.g.*, *Fuller v. Heintz/Candee*, No. 07-CV-305-BBC, 2008 WL 5423199, at *3 (W.D. Wis. Dec. 30, 2008) (applying Rule 54(b) because "the order being challenged . . . was not one entering judgment on the issue of attorney fees because they had not yet been itemized").

## ARGUMENT

As detailed herein, Plaintiffs' counsel's conduct in this case does not rise to the bad faith, vexatious or reckless standard needed to award sanctions under 28 U.S.C. § 1927. *See, e.g.*, *Willert v. Andre*, No. 17-CV-496-JDP, 2018 WL 3637951, at *12 (W.D. Wis. July 30, 2018) (denying sanctions and noting that when plaintiffs filed their claims, they did have reason to suspect that defendant had breached the underlying contract, and plaintiffs "presumably were hoping to uncover additional evidence in discovery, but failed to do so. Their claims were ultimately unsuccessful, but they were not entirely groundless."); *Blair v. Equifax Check Servs., Inc.*, No. 97

C 8913, 1999 WL 116225, at *9 (N.D. Ill. Feb. 26, 1999), *aff'd*, 181 F.3d 832 (7th Cir. 1999) ("While this conduct may constitute ordinary negligence, it certainly does not rise to the level of recklessness or indifference to the law."). Rather, given the information learned from their investigation, their continuous requests for further explication and additional discovery, and the opaque nature of Menards' rebate system and November production, Plaintiffs' counsel acted reasonably and dismissed the action as soon as they had evidence that certain named Plaintiffs did not have viable claims.

## I.   PLAINTIFFS' COUNSEL CONDUCTED AN ONGOING, EXTENSIVE AND MULTI-YEAR INVESTIGATION.

In finding that Plaintiffs' counsel acted recklessly in purportedly not continuing to investigate Plaintiffs' claims, the Court stated that Plaintiffs' "counsel says that they conducted a multi-year investigation into the Menards rebate program and interviewed dozens of potential plaintiffs to find class representatives," but that "counsel does not explain any efforts they made to verify the named plaintiffs' allegations either before or after the lawsuit was filed."  Order at *7, citing Dkt. 100 at 7.  Plaintiffs' counsel described those efforts, if admittedly in a general manner given the length and involvement of the multi-year investigation, in the Declaration of David S. Almeida submitted in support of Plaintiffs' Opposition to Menards' Motion for Sanctions. *See* Dkt. 103, Declaration of David S. Almeida, dated May 11, 2021 ("Almeida Decl.") ¶¶ 3-10.

Plaintiffs' counsel conducted a thorough investigation, including, but not limited to, interviewing the representative Plaintiffs numerous times (at the client intake stage, in connection with preparation of the original and amended complaints (both of which withstood motions to dismiss), in responding to Menards' written discovery requests and later in preparing the witnesses for deposition) and thoroughly reviewing their history of purchases and rebates, as well as any

documents that would support or undermine Plaintiffs' repeated claims that they had not received all rebates owed from Menards.

As a result of their investigation, Plaintiffs' counsel obtained the following detailed information (regarding often small dollar purchases made years prior) in connection with several of the Plaintiffs' rebate experiences before filing the case: (i) the date (or at least the month and year) of their purchase(s); (ii) the store where Plaintiffs purchased their items; (iii) the amount of their purchases; (iv) the amount of the rebate to which Plaintiffs believed they were entitled; and (v) the actions the Plaintiffs took to redeem those rebates. *See generally* Am. Compl., Dkt. 27, ¶¶ 89-95 (Schussler), ¶¶ 96-111 (Shores), ¶¶112-126 (Earls), ¶¶ 127-135 (Kiel), ¶¶ 136-144 (Lietaert), ¶¶ 145-155 (Fetsch) & ¶¶ 156-165 (Jesse).) Prior to filing, each and every representative Plaintiff reviewed and approved the amended complaint.[6] Plaintiffs consistently and repeatedly told undersigned counsel that they did not receive their rebates or, at least, not in the full amount owed.

Plaintiffs' confusion underscores the lack of transparency in Menards' rebate system after a customer submits a rebate. The core of Plaintiffs' case has always been that Menards operates a rebate program which is opaque and misleading because consumers have little visibility into when and whether Menards awards the full or partial rebates (or no rebate at all). *See* Dkt. 27, Am. Compl., ¶¶ 62-69. Once a Menards shopper submits her original receipt and rebate form, she may wait months to receive an in-store rebate check, and even if she gets one, it will not identify the transactions at issue or whether and why Menards reduced the rebate. For the named plaintiffs

---

[6]     The robust investigation prior to filing the case was not limited to understanding individual Plaintiff's claims as Plaintiffs' counsel spent months if not more trying to learn how Menards' rebate program operated and why so many individuals believed they had not received all rebates owed. *See generally* Original Complaint, Dkt. 1 ¶¶ 35-59; Amended Complaint, Dkt. 27, ¶¶ 45-89.

and so many others with whom Plaintiffs' counsel spoke, even if they received a rebate check, the amount of the rebate did not match up with their understanding of what they were owed based on the stated terms of Menards' rebate program.  For these reasons, the relevant detailed evidence concerning the rebates awarded and redeemed to Plaintiffs and the transactions underlying those rebates, was exclusively in the control of Menards. And in this case, related to the three named plaintiffs who were deposed, Menards either did not produce the entirety of that detailed evidence until February 8, 2021 or did not reveal it until their deposition itself.

## II.   PLAINTIFFS' COUNSEL SPENT MONTHS ATTEMPTING TO OBTAIN RELEVANT AND COMPREHENSIBLE INFORMATION FROM MENARDS.

In addition to the investigatory efforts outlined above, Plaintiffs' counsel expended considerable time and energy attempting to understand Menards' document production.  *Cf.* Order at *8 n.3 (stating that "plaintiffs' counsel does not describe any efforts they took to review the November 2020 production").  The significant discovery process was detailed in Plaintiffs' Motion to Compel Documents and Rule 30(b)(6) deposition testimony filed on March 1, 2021.  *See generally* Dkt. Nos. 81 (Motion to Compel), 82 (Brief in Support) and 86 (Declaration of Sabita Soneji ("Soneji Decl.").[7]

### A.   Menards' Database Production in November 2020 Was Voluminous and Unintelligible

Following the entry of a Protective order on November 16, 2020 (Dkt 45), Menards began to produce documents on a rolling basis.  *See* Motion to Compel at 8; Soneji Decl., ¶ 4. The first

---

[7]     The Court may not be as familiar with these extensive discovery efforts because Plaintiffs' motion to compel was never ruled upon by the Court. On March 8, 2021, in connection with their unopposed motion to voluntary dismiss, (Dkt. Nos. 92 and 93), Plaintiffs filed a notice of withdrawal of the motion to compel. Dkt. 90.

documents were produced by Menards on November 18, 2020, and undersigned counsel immediately reviewed those documents.

The following are the production Menards' made in November 2020 and the categories of documents produced:

- November 18, 2020—consisting of only advertisements, MENARDS-EARLS_0001 to MENARDS-EARLS_6173);

- November 24, 2020—consisting of Rebate International rebate manual and some transaction documents for plaintiffs, (MENARDS-EARLS_6174-6356 and MENARDS-EARLS_6357-8796);

- November 25, 2020—consisting of files with numbers and years with rebate amounts redeemed and

- November 27, 2020—consisting of 95 Excel spreadsheets, containing approximately 1 million lines of data each, containing information on all rebates that were submitted and entered into Menards' system during the class period 2014-2017, (MENARDS-EARLS_8799-8893).

Although Menards claimed in its sanctions motion that the information produced in November 2020 was sufficient to evaluate Plaintiffs' claims, the production did *not* contain information regarding any problems Menards might have had in processing the rebate receipts or issues that might lead to rebates being rejected or adjusted; information that was especially germane to Plaintiffs' claims that they had not received their rebate at all or in the amount that was owed.

Plaintiffs sent counsel a deficiency letter on November 23, 2020. In late November, Plaintiffs' counsel undertook at least two "meet and confer" conferences (both via email and telephonically) trying to get Menards to (i) produce responsive documents and (ii) explain the documents it had already produced. *See* Motion to Compel, § B at 4-9 ("Menards' Refusal to produce the relevant information and the parties' efforts to meet and confer in an attempt to resolve the impasse"); *see also* Soneji Decl., ¶¶ 5-7, Exs. E, F & G thereto (attaching emails).

11

Menards is being disingenuous when it claims that it produced all the information necessary to evaluate Plaintiffs' claims in November 2020.  In fact, on February 8, 2021, Menards produced 2,824 documents (bates range MENARDS-EARLS_0010794 to 0013618), including detailed information for rebates issued to Plaintiffs and detailed information regarding relevant Plaintiff transactions.  Menards failed to mention this production in its Motion for Sanctions, (*see generally* Dkts. 97 & 98), ***even though they rely on and attach to their Motion for Sanctions numerous documents that were not produced until February 8, 2021***. *See* Dkt. 98-17 (MENARDS-EARLS 0011024-11039), Dkt. 98-30 (MENARDS-EARLS_0011843), Dkt. 98-34 (MENARDS-EARLS_0010892), Dkt. 98-38 (MENARDS-EARLS_0013538-13544), Dkt. 98-39 (MENARDS-EARLS_0011430-11435), Dkt. 98-40 (MENARDS-EARLS_0013526-13530), Dkt. 98-41 (MENARDS-EARLS_0013327), Dkt. 98-44 (MENARDS-EARLS_0011424-11425), Dkt. 98-45 (MENARDS-EARLS_0011460).

Rather, when Menards claims it produced all the rebate details for the named plaintiffs, it is referring to the 95 spreadsheets containing 95 million lines of data reflecting every 11% Off Everything rebates Menards recorded from February 1, 2014 to December 3, 2017.  During the deposition of representative Plaintiff Chris Jesse, Menards' counsel described the spreadsheets as follows:

> Q. Okay. So I'm going to make another representation to you, sir. I'm going to tell you that in the course of this lawsuit and back in the fall Menards produced all details of all of the 11% off rebates that it had processed and issued from February 2014 to December 2017, okay? Just accept my representation?
>
> A. Okay.
>
> Q. It's about 95 spreadsheets with a million lines in each, okay?
>
> A. Okay.

Jesse Dep Tr. at 179:15-24.  Though the data was voluminous, it only showed the total amounts of purchases and the rebate amounts issued.  *See* Motion to Compel at 9; Soneji Decl., ¶ 8; and Ex. H.  But those records did not show the transaction history (*i.e.*, what was purchased and in what amount), or indicate if there was an "error" in processing the receipt that might lead to the receipt being rejected or adjusted.  *Id*. Nor did the data show how to connect purchase amounts with related rebate amounts (which were separately logged in the sea of 95 million lines of data).

The information in Menards' November 27, 2020 database production was so indecipherable that Menards created a composite document which distilled a few lines of data from different parts of the massive November 27, 2020 production to examine three named Plaintiffs during their depositions. That composite document was *not* produced prior to Plaintiffs' depositions.  *See* Jesse Dep Tr. at 179:15-24 (in introducing the composite exhibit: "Q. Okay. Now, I'm going to take it you've never seen something that even looks like this in Exhibit 40 before, right? A. No.").

In telephonic meet and confers, Plaintiffs' counsel asked Menards for explication on what the terms and acronyms meant in the spreadsheets so that they could continue to evaluate their Plaintiffs' claims.  *See* 4/21/22 Soneji Decl., ¶ 6.  The parties met and conferred regarding Menards' initial discovery responses on December 2, 2020.  Dkt 86, Soneji Decl., ¶ 8.  In an effort to narrow and specify their requests, Plaintiffs then served their Second Set of Requests for the Production of Documents on Menards on December 3, 2020.  *Id*., ¶ 9. The parties met and conferred regarding this set of requests on February 5, 2021.  *Id*., ¶ 10; Soneji Decl., ¶ 17). Menards' counsel refused to provide a key or legend for the spreadsheets and instead directed Plaintiffs' counsel to ask about the production during 30(b)(6) depositions.  *See* 4/21/22 Soneji Decl., ¶ 7.

**B.**   **Plaintiffs Attempted to Decipher Menards' November 2020 Database Production Through 30(b)(6) Depositions in late December 2020 and early January 2021.**

While Plaintiffs' counsel was making considerable efforts to obtain and understand relevant written discovery, they were also proceeding with depositions. Menards produced Michelle Rehder, an assistant manager of marketing, as its first Federal Rule of Civil Procedure 30(b)(6) corporate designee for deposition on December 31, 2020.  *See* Dkt Nos. 69 (part 1) & 70 (part 2); *see also* Soneji Decl., ¶ 21, Ex. R (Plaintiffs' Notice of 30(b)(6) Deposition to Menards); Ex. S (transcript of Rehder deposition). However, Menards failed to adequately prepare its designee with respect to her deposition Topics 1 and 4.  More importantly, Ms. Rehder had never seen the November 27, 2020 spreadsheets and could not provide any testimony explaining how to read it.

Menards produced, on January 6, 2021, a second corporate designee, Matt Bittner, an information systems manager, who was able to provide some information regarding the data fields in the November 27, 2020 spreadsheets. But even then, he was not able to answer Plaintiffs' counsel's questions regarding some of the various coding and terminology.  *See generally* Dkt No. 68 (part 2), Bittner Dep. Tr. at 113:10-20.

Mr. Bittner also specifically testified during the deposition that Menards could generate a report showing all rebates submitted, as opposed to just rebates issued; an important distinction where Plaintiffs' counsel was trying to determine if Menards had received and redeemed all of Plaintiffs' rebate submissions. *See* Soneji Decl. at Ex. L, Bittner Tr. at 105:106:3.  Mr. Bittner further testified that Menards could export a range of customer transaction details, though they had not included that information in the spreadsheets that were produced. *Id*. at 95:18-97:15. However, on February 12, Menards' Rule 30(b)(6) deponent (Mr. Bittner) materially changed his deposition

14

testimony via an errata sheet.   Mr. Bittner previously testified "yes" to whether it would be "possible to create a report" to "export transaction details from 2014 to 2017."  Soneji Decl., ¶ 19 & Ex. L, Bittner Tr. at 95:18-97:15.   However, Mr. Bittner then changed his testimony via his errata sheet to claim "Customer transaction data can be exported from Oracle, but the ability to do so depends on the specific request."  Soneji Decl., ¶ 20 & Ex. Q.  Plaintiffs separately moved to strike this errata as it was an improper revision of testimony, (*see* Dkt. 76), but later withdrew that motion when they sought voluntarily dismissal of their claims.  *See* Dkt. 91.

Mr. Bittner's testimony confirmed the complexity of the rebate program spreadsheets Menards produced as he testified that the amount displayed on the rebate receipt (provided to the customer at the point of sale and required to be submitted in connection with the rebate request (*i.e.*, the amount the consumer is expecting to receive)) and the amount calculated by Menards' rebate system as reflected in the spreadsheets could differ:

> 1 Q. Okay. And amount which is column F, that's the
> 2 purchase amount?
> 3 MR. BOLAND: Same objection.
> 4 THE WITNESS: That's the rebate amount.
> 5 BY MS. MORALES:
> 6 Q. Oh, okay, that's the amount issued. I see. And
> 7 that's the amount issued as it's been calculated by
> 8 the database?
> 9 MR. BOLAND: Objection, vague and
> 10 ambiguous.
> 11 THE WITNESS: The amount calculated by the
> 12 system.
> 13 BY MS. MORALES:
> 14 Q. Okay. And this is the amount that the system has
> 15 calculated when the rebate submission has been
> 16 processed; is that right?
> 17 A. It would be the amount calculated when it was entered
> 18 into the system.
> 19 Q. Okay. So it wouldn't necessarily be the amount that's
> 20 reflected on the rebate receipt that the customer
> 21 gets; is that right?
> 22 MR. BOLAND: Objection, vague. You can

23 answer.
24 THE WITNESS: Yes, that could be true.

Dkt. 68, Bittner Dep. Tr. at 109:1-25.

As described above, Plaintiffs' counsel did not need information from Menards to verify basic facts about the plaintiffs' own conduct." Order at *8. Rather they needed information from Menards to understand how *it* processed Plaintiffs' rebate form submissions and how its database maintained records of rebates submitted and redeemed. Menards did not provide that information in any discernible way through written discovery or in corporate deposition testimony.

## III. DETERMINATION OF THE REBATE AMOUNTS OWED AND RECEIVED IS NEITHER SIMPLE NOR STRAIGHTFORWARD.

In its Order, the Court admonishes Plaintiffs' counsel because "the allegations made by the plaintiffs were straightforward, and all relied on facts within the plaintiffs' own knowledge." Order at *7. The Court also expressed its belief that all the information that counsel needed to prove a negative (that certain named plaintiffs did *not* receive rebates they contended they were entitled to) was already in their possession. *Id.* at *9 (stating that "[i]t's unclear why plaintiffs would need to conduct further investigation to identify the documents that they relied on to form the allegations in the complaint."). But only Menards had the detailed accounting that would make it possible to pair Plaintiffs' purchases with the issued rebates. Absent that detailed accounting, some of which was produced in inscrutable form in the November 27, 2020 spreadsheets and was not adequately explicated until the witness depositions, and much of which was not produced until February 8, 2021, Plaintiffs' counsel did the most thorough investigation they could and reasonably relied on the consistent and repeated claims of Plaintiffs that anticipated rebates had not been received. In short, Plaintiffs' counsel worked diligently over the course of

several months to seek relevant data, follow up on discovery Menards failed to produce, and review the discovery Menards did produce, and not until March 2021 did they have information that definitively showed that two of the named Plaintiffs' claims lacked factual support.

As detailed in the Motion to Compel and the accompanying Soneji Declaration, Plaintiffs' counsels' work in attempting to obtain relevant information and explication regarding the same was extensive. Plaintiffs' counsel addresses the specific concerns about each representative Plaintiff in turn below.[8]

### A.    Barry Earls

The Court cited Plaintiffs' counsels' continuing representation of Plaintiff Barry Earls post-November 2020 because "[i]n his deposition, Barry Earls testified that he knew that a rebate promotion was not running at the time he made his purchases." Order at *7 (citing Dkt. 98-1 (Earls Dep. Tr. 89:4–12).)  However, *in that very same exchange*, Plaintiff Earls testified that he went to the Menards' location the following day (June 18, 2017) and was informed by a Menards' employee "that, not to worry, that [he] was still eligible for the 11 percent offer, [he] just had to fill out an extra piece of paper." *Id*. at 97:2-98:6.

Mr. Earls' testimony makes it clear that he was told by a representative of Menards that, despite the fact that he purchased lumber to build a pole barn on June 17, 2017 (one day before the 11% off rebate program was active), Menards was nevertheless going to honor the promotion and provide him an 11% rebate, one he contends he has to this day never received.

---

[8]      At each of the representative Plaintiffs' depositions, Menards' counsel used a composite exhibit, which purportedly contained a few lines of data hand selected from the 95 spreadsheets containing information on 95 million processed rebates.  The composite exhibit was not produced at any point prior to the depositions.  *See, e.g.*, Jesse Dep. Tr. at 179:15-24. And absent some training on how to read that database from which the 95 million lines of rebate data came, Plaintiffs' counsel was unable to identify the relevant lines of data for each named Plaintiff.

*See id.* at 98:4-6 (stating that he did not "remember them wording it as a price adjustment; "*they just said that I was still eligible for the refund, or rebate*") (emphasis added).  While Mr. Earls may have known that a rebate promotion was not running on June 17, he unmistakably testified that he rightfully thought his purchase was nonetheless eligible and that he thought that it was a rebate *not* a price adjustment.[9]

During Mr. Earls' deposition on February 24, 2021, Menards' counsel a transaction detail receipt, which was not produced until February 2021.  *See id.* at 101:25-108:9.  Mr. Earls testified that he did not believe that he returned certain items that would have reduced the amount of his anticipated rebate:

> A. I honestly don't remember returning all of that stuff.
>
> Q. Is it your testimony that you're not sure whether you made returns related to the pole barn garage, that you just don't know?
>
> A. I don't remember making all those returns.
>
> Q. Is it possible that you did?
>
> A. To be honest with you, I don't see how I could have and still built the barn.

*Id.* at 107:17-25.  The import of this testimony is clear; Plaintiffs' counsel could not have known whether Mr. Earls had returned any items (thereby decreasing the amount of his anticipated rebate) because Mr. Earls "honestly" did not "remember" and Menards did not produce that transaction

---

[9]    Barry Earls purchased items during an 11% Off Price Adjustment promotion—which is a sale that retroactively applies to products purchased before an 11% Off Everything Sale and has similar but not identical terms. In the emails with customer service which the Court cites, Menards' customer service claimed that the reason Plaintiff Earls did not receive the full 11% price adjustment was that he purchased an item on sale—a term specific to Menards' price adjustment but not applicable to the 11% Off Everything Sale.  *See* Soneji Decl., Dkt. 102, ¶ 16.  Menards' explanation for denying his rebate made little sense as Barry Earl's receipts showed no items purchased were on sale.  *See id.* Even the Menards' store manager with whom Mr. Earls spoke after his rebate was denied was confused, telling him he did "everything right" and should have received his full rebate.  *See* Dkt. No. 28, ¶ 123.

information until February 8, 2021, just days before his deposition. *Cf.* Order at * 8 (stating that "Menards produced the records related to plaintiffs' allegations in November 2020").[10]

In sum, Plaintiff Earls maintained to his counsel through many interviews that his purchase was eligible for a rebate and testified as much. Menards told him that the purchase was rebate-eligible and then later denied his rebate, claiming the item was purportedly on sale and the applicable price adjustment promotions (as opposed to 11% Off rebate promotions) exclude sale items, even though his receipt shows that the items he purchased were not on sale. Mr. Earls did not recall that he returned certain of those items purchase on the June 17, 2017 thereby decreasing the amount of his rebate-eligible purchases. It was reasonable for Mr. Earls to assert and continue to pursue his claim that he had not received his fully-owed rebate. Indeed, to this date, no documents Menards ever provided demonstrate that Mr. Earls received his full rebate. Mr. Earls' testimony establishes that he had a good faith belief that Menards was permitting him to participate in the 11% off rebate promotion starting on June 18, 2017. The record evidence does not demonstrate any unreasonable or vexatious conduct on the part of his counsel. *See, e.g.*, *Timothy B. O'Brien LLC v. Knott*, No. 18-CV-684-JDP, 2019 WL 4722483, at *3 (W.D. Wis. May 16, 2019), *aff'd*, 962 F.3d 348 (7th Cir. 2020) (stating that sanctions "are to be imposed sparingly, as they can 'have significant impact beyond the merits of the individual case'") (quoting *Hartmarx Corp. v. Abboud*, 326 F.3d 862, 867 (7th Cir. 2003).

---

[10]     Menards' February 8, 2021 production consisted of 2,824 documents, bates range: MENARDS-EARLS_0010794 to 0013618. The transaction detail introduced by Menards' counsel at Mr. Earls' deposition was Bates MENARDS-EARLS_0011037 (thus clearly within the February 8, 2021 production).

### B.    Trent Shores

Menards did not produce the transaction details regarding Trent Shores' relevant purchases until February 8, 2021.[11]  To the extent Menards' November 27, 2020 spreadsheet production included amounts of Mr. Shores transactions and rebates, those were not apparent to Plaintiffs' counsel until at least the relevant transaction data was produced in February 2021. In its Order, the Court expressed concern about the fact that Trent Shores produced in discovery a receipt for his purchase that showed it was not made during an 11% promotion.  *See* Order at *7. However, whether or not the promotion was characterized as a rebate or a price adjustment, similar to Plaintiff Earls' confusion, it was reasonable for Plaintiff Shores to believe that he was entitled to a rebate for his purchase. Learning about and identifying a possible sub-class of persons who were entitled to, but did not receive, a price adjustment promotion (or were led to believe they were eligible for the rebate promotion) is the very purpose of discovery and cannot support the imposition of sanctions.

### C.    Tom Fetsch

In its Order, the Court states that Tom Fetsch produced emails between himself and Menards' customer service that showed he had received and redeemed all the rebates that formed the basis for his allegations in the complaint.  *See* Order at *7.  However, the records detailing

---

[11]     Menards' February 8, 2021 production consisted of 2,824 documents, bates range: MENARDS-EARLS_10794 to 13618.  The transaction detail Menards' counsel produced for Plaintiff Shores were documents bates-stamped MENARDS-EARLS_13557-13562 (thus clearly within the February 8, 2021 production).

Tom Fetch's rebate history, which showed that he had redeemed certain rebates he believed were not paid, were also not produced until February 8, 2021.[12]   Soneji Decl., ¶ 17.

Just as with Plaintiffs Jesse and Earls, Menards' counsel used a composite exhibit, made up of a few lines of data from the voluminous November 27, 2020 spreadsheet production, to walk through total amounts of the relevant purchases and rebates. Again, that composite exhibit was not produced prior to the deposition.

### D.   Steve Schussler and Chris Jesse

Both Steve Schussler and Chris Jesse alleged that they had not received rebates for eligible purchases made in 2017.  *See* Order at *7.  The Court concluded that "both had been issued rebates for those purchases that they later redeemed."  *Id.* (citing Dkt 98-41 (Schussler transaction records) and Dkt. 98-3 (Jesse Dep. 219:18–220:8)). The Court expressed concern about Plaintiffs' counsel maintaining these claims because, although the rebate amounts were smaller than Schussler and Jesse expected (after factoring in returns), in the initial and amended complaint, they alleged that they had not received any rebate at all.  *See* Order at *7 (stating that "it's likely that a thorough discussion with Schussler and Jesse about their rebate history would have revealed that they had received the full value of the rebates they were entitled to").

In the Amended Complaint, Plaintiff Jesse alleges that he made a purchase in November 2017 for $2,825 and was therefore owed a $310 rebate. *See* Dkt. 27, ¶¶ 158-160.  During his deposition, Menards' counsel walked Mr. Jesse through a number of transactions he made in the Fall of 2017, and cross-referenced those purchases with rebates, ranging from $.55 to $267.21,

---

[12]   Menards' February 8, 2021, production consisted of 2,824 documents, bates range: MENARDS-EARLS_10794 to 13618.  The transaction detail introduced by Menards' counsel at Mr. Fetsch's deposition was Bates MENARDS-EARLS_13201 (within the February 8, 2021, production).

reflected on the composite spreadsheet that was introduced for the first time at the deposition. *See* Jesse Dep. Tr. at 179:11-209:5. Thus, although Mr. Jesse was expecting a rebate check in the amount of $310 for his $2,824 purchase, he instead received a combination of various rebates, all issued on one rebate check (no. 8497) in the amount of $448.31. *See id.* at 210:23-211:17. The rebate check was not accompanied by any information or itemization that would have informed Mr. Jesse of the fact that the $310 rebate for the $2,825 purchase was included therein. It was, simply put, not obvious that Mr. Jesse received his $310 refund as it is not simple to search through the 95 million lines of rebates to match up the rebate amounts (none of which were for $310) and cross reference those to the transaction amounts. Moreover, the details of the $448.31 rebate check that was issued to Plaintiff Jesse, including information regarding to which purchases that rebate related, was not produced until February 8, 2021 and thus could not have been "obvious" to Plaintiffs' counsel. *See id.* at 210:13-214:13.

With respect to Plaintiff Schussler, the full transaction history for the relevant transactions (including his original transaction history, his scanned rebate submission, the "barcode history" and a number of returns he made after his transaction but before his rebate paperwork) were also not produced until February 8, 2021.[13]

* * * * *

Approximately two weeks after that February 8, 2021 production, Chris Jesse, Barry Earls and Thomas Fetsch began sitting for depositions on February 23, February 24 and March 2, 2021, respectively. *See* Soneji Decl., ¶ 15. During these depositions, Menards' counsel walked the

---

[13]    Menards' February 8, 2021 production consisted of 2,824 documents, bates range: MENARDS-EARLS_10794 to 13618. The documents produced by Menards' relevant to Plaintiff Schussler were Bates MENARDS-EARLS_13431-13544 and thus within the February 8, 2021 production.

deponents through the transaction and rebate detail documents, some of which had just been produced, and the "composite" document which was never produced prior to deposition.

In awarding sanctions, the Court concluded that "[a]ll these facts were available to plaintiffs' counsel well before Earls, Fetsch, and Jesse sat for their depositions in February and March of 2021" and that "[d]espite this, counsel continued to litigate the case for several more months." Order at *7. But, taken as a whole, the experiences of these representative Plaintiffs amply demonstrate the opacity of Menards' rebate program; these Plaintiffs were unable to determine whether they had received a rebate for a particular item. For example, multiple rebates for multiple purchases were combined and issued with no itemization included with the rebate. Or the rebate Plaintiffs expected was inexplicably reduced and thus the rebate amount differed from Plaintiffs' expectations. Only Menards' had the unilateral ability to access these transaction and rebate records.

At a minimum, that history undermines Menards' claims that Plaintiffs' counsel acted vexatiously or in bad faith. As noted above, section 1927 sanctions are appropriate only in instances of "serious and studied disregard for the orderly process of justice." *Ross v. City of Waukegan*, 5 F.3d 1084, 1089 n. 6 (7th Cir. 1993) (quoting *Kiefel v. Las Vegas Hacienda, Inc.*, 404 F.2d 1163, 1167 (7th Cir. 1968). It cannot be said, based upon the foregoing, that counsel for Plaintiffs acted unreasonably and they should not bear the brunt of Menards' legal fees for bringing a case in good faith to vindicate their clients' belief that they had not received rebates in the amounts to which they believed they were entitled.

Plaintiffs had a substantial belief in their claims. As soon as it became clear that these Plaintiffs were not the appropriate persons to litigate these issues, undersigned counsel, with client approval, sought leave of this Court to dismiss their claims with prejudice. *See* Dkt. Nos. 91 &

23

92; *see also* Order at *10 ("Plaintiffs' counsel deserves credit for dismissing this case in March 2021."). Rather than acting vexatiously or recklessly, Plaintiffs' counsel acted reasonably and the factual record cannot support an award of sanctions. *See also Blair*, 1999 WL 116225, at *9 ("While this conduct may constitute ordinary negligence, it certainly does not rise to the level of recklessness or indifference to the law."); *Willert*, 2018 WL 3637951, at *12 (denying sanctions and finding that plaintiffs "presumably were hoping to uncover additional evidence in discovery, but failed to do so. Their claims were ultimately unsuccessful, but they were not entirely groundless.").

## IV.   THE RECORD EVIDENCE DEMONSTRATES THAT PLAINTIFF'S COUNSEL DID NOT ACT UNREASONABLY OR VEXATIOUSLY THUS THE IMPOSITION OF SANCTIONS WAS NOT WARRANTED.

The Order provides:

> It appears that some of the plaintiffs *believed* that they had not been issued a proper rebate; plaintiffs' counsel argues that some plaintiffs may have been confused by the fact that some rebate checks included rebates from multiple purchases. ***But plaintiffs and counsel were capable of tallying up plaintiffs' purchases and comparing them to the rebate checks they received and redeemed. And although Menards possessed detailed transaction and rebate records, Menards produced the records related to plaintiffs' allegations in November 2020.*** Plaintiffs' counsel complains that Menards did not connect the dots for plaintiffs until after plaintiffs filed their motion for class certification. But counsel does not dispute that the two sets of records contained all the information they would need to determine whether the plaintiffs had received their proper rebates.

Order at *8 (internal citations omitted).

As established above, Plaintiffs' counsel acted reasonably, based on all available information and on repeated interviews of dozens of plaintiffs who gave consistent answers, and tried to find out the precise details pertinent to Plaintiffs' claims by comparing the relevant purchases and rebates, including by trying to understand the information produced by Menards in

November 2020.  Menards, on the other hand, was sitting on information that it contends demonstrated that Plaintiffs did not have viable claims, only to reveal it *after* Plaintiffs moved for class certification (which Plaintiffs offered to delay but Menards insisted go forward) and at Plaintiffs' depositions.  And, even if the Court concludes that it should have been clear to Plaintiffs' counsel in November 2020 that some named plaintiffs' claims were not viable, counsel's decision to continue the case until it received the detailed evidence of transactions and rebates was reasonable or, at worst, negligent.  *See, e.g.*, *Stockbridge-Munsee Cmty. v. Wisconsin*, No. 17-CV-249-JDP, 2018 WL 708389, at *4–5 (W.D. Wis. Feb. 2, 2018), *aff'd*, 922 F.3d 818 (7th Cir. 2019) (denying sanctions because "'[s]imple negligence' by the attorney does not warrant a sanction under § 1927").

The record evidence demonstrates that the imposition of sanctions on Plaintiffs' counsel is not warranted and does not meet the heightened standard under § 1927. *See, e.g.*, *City of Waukegan*, 5 F.3d at 1089 n.6 (stating that § 1927 sanctions are appropriate only in instances of "serious and studied disregard for the orderly process of justice.") (quoting *Kiefel*, 404 F.2d at 1167); Order Granting Motion for Voluntary Dismissal at 3-4, *ARcare, Inc. v. American Lifeline, Inc.*, No. 3:17-cv-00313-wmc, (W.D. Wisc. Nov. 22, 2017) (observing that while plaintiff was certainly not "blameless" in the situation, "defendant's failure to make further efforts to streamline this litigation and save time and effort on the part of both the litigants and the court, does not justify taxing fees and costs or other sanctions on balance").

## V.    A HEARING TO ADDRESS ANY SPECIFIC CONCERNS THE COURT MAY HAVE IS WARRANTED.

Despite the foregoing, and without the benefit of a hearing, the Court concluded that "[a]ll attorney fees that Menards incurred after plaintiffs' counsel submitted their responses to Menards' interrogatories on November 25, 2020, were the result of counsel's unreasonable and vexatious

continuation of the lawsuit." Order at *10. Counsel for Plaintiffs are very experienced attorneys, with decades of experience litigating consumer class action lawsuits, both on the plaintiff and defense side. *See* Soneji Decl., Dkt. 102, ¶ 2; Almeida Decl., Dkt. 101, ¶ 2. In their respective twenty year-plus careers, neither attorney has been sanctioned in connection with any action. *See* Soneji Decl., Dkt. 102, ¶ 2; Almeida Decl., Dkt. 101, ¶ 2. Counsel expended tremendous time, effort and resources to litigate this case and to properly represent Plaintiffs' interests. *See* Almeida Decl, ¶ 3; Soneji Decl, ¶¶ 3-11 & 15. Sanctions are not warranted on this record. *See, e.g., Overnite Transp. Co. v. Chicago Indus. Tire Co*., 697 F.2d 789, 794 (7th Cir.1983) (stating that section 1927 sanctions are intended to apply only to those lawyers who "needlessly delay ongoing litigation") (emphasis in original).

Plaintiffs' counsel take their duty under Federal Rule of Civil Procedure 1 and their ethical obligations incredibly seriously and are (understandably) deeply concerned about the Court's consideration of sanctions here. Therefore, Plaintiffs' counsel respectfully requests the opportunity to address those concerns in person at a hearing. Given the importance of the issues involved, Plaintiffs' counsel contends that a hearing is warranted. *See, e.g.*, *Khan v. Lathrop*, No. 19-CV-979-JDP, at *1 (W.D. Wis. Nov. 10, 2021) (noting that the Court "would hold a hearing about [plaintiff's] request for sanctions").

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs Barry Earls, Thomas Fetsch, Trent Shores, Steve Schussler, Cassie Lietaert and Chris Jessie respectfully request this Honorable Court to (i) reconsider its Opinion and Order dated March 31, 2022, Dkt. 106; (ii) vacate its award of sanctions from November 25, 2020 through March 2021; (iii) schedule a hearing whereby the parties may present evidence on any specific issue of concern to the Court, including, but not limited to, the

issue of thoroughness of the investigation conducted by Plaintiffs' counsel throughout the pendency of the litigation and (iv) award all such other relief as is equitable and just.

Dated:      April 21, 2022                              Respectfully submitted,

                                                        */s/ Sabita J. Soneji*
                                                        Sabita J. Soneji (*admitted pro hac vice*)
                                                        **TYCKO & ZAVAREEI LLP**
                                                        1970 Broadway, Suite 1070
                                                        Oakland, California 94612
                                                        (510) 254-6808
                                                        ssoneji@tzlegal.com

                                                        */s/ David S. Almeida*
                                                        David S. Almeida
                                                        **BENESCH, FRIEDLANDER, COPLAN
                                                        & ARONOFF LLP**
                                                        71 S. Wacker Dr., Suite 1600
                                                        Chicago, Illinois 60606
                                                        (312) 212-4979
                                                        dalmeida@beneschlaw.com

                                                        *Attorneys for Plaintiffs*